IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **GOTTSCHALKS INC., a Delaware corporation,[1]** | : | **Case No. 09-10157 (KJC)** |
| **Debtor.** | : | |
| | : | |
| | : | |
| **GOTTSCHALKS INC.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **Adv. Proc. No. 09-52319 (KJC)** |
| | : | |
| **RIVER PARK PROPERTIES III,** | : | |
| **LANCE-KASHIAN & COMPANY,** | : | |
| **EDWARD KASHIAN, and** | : | |
| **JENNIFER SCHUH,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## THE DEBTOR AND DEBTOR-IN-POSSESSION'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Dated: April 14, 2010

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Lee E. Kaufman (No. 4877)
Drew G. Sloan (No. 5069)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 351-7701

Stephen H. Warren
Marc Feinstein
Karen Rinehart
Justine M. Daniels
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

*Counsel to Debtor and Debtor-in-Possession*

---

[1] The Debtor in this case, along with the last four digits of the federal tax identification number for the Debtor, is Gottschalks Inc. (9791). The Debtor's corporate offices are located at 7 River Park Place East, Fresno, California 93720.

# TABLE OF CONTENTS

Page No.

INTRODUCTION ................................................................................................... 1

I.  GENERAL BACKGROUND.......................................................................... 3

    A.  The Debtor's Limited Partnership and Lease With
        Defendants ................................................................................... 3

    B.  The Debtor's Bankruptcy and Efforts to Market Its LP
        Interest and Lease ........................................................................ 4

    C.  Defendants' Wrongful Interference With the Debtor's
        Efforts to Assign the LP Agreement and Lease............................ 5

        1.  Kashian Deliberately Drove Away an Interested
            Buyer........................................................................... 6

        2.  Kashian Poisoned the Market ........................................... 8

    D.  The Penalty Clause, Right of First Refusal, and Threat of
        an Exorbitant Capital Call Have Stymied the Debtor's
        Efforts to Assign Its LP Interest and Lease. ................................. 9

        1. The Penalty Clause ................................................................ 9

        2. The Right of First Refusal..................................................... 11

        3. The Capital Call .................................................................... 11

    E.  Defendants' Other Efforts to Squeeze Out the Debtor ................ 12

II.  STANDARD FOR SUMMARY JUDGMENT....................................... 14

III.  DEFENDANTS HAVE WILLFULLY VIOLATED THEIR
      FIDUCIARY DUTIES TO THE DEBTOR. .......................................... 15

IV.  THERE ARE ISSUES OF MATERIAL FACT REGARDING
      THE DEBTOR'S CLAIM THAT DEFENDANTS VIOLATED
      THE AUTOMATIC STAY. ................................................................ 16

    A.  There Are Material Facts At Issue Regarding the Debtor's
        Claim That Defendants Interfered With the Debtor's
        Efforts to Assign Its Interest in the Limited Partnership and
        Lease. ........................................................................................ 17

        1.  Bankruptcy Courts Have Consistently Recognized
            That Interference With the Debtor's Efforts to
            Assign Its Property Constitutes a Violation of the
            Automatic Stay.............................................................. 18

        2.  Defendants' Misrepresentations and Poisoning of
            the Market Have Interfered with the Debtor's
            Ability to Assign Its Assets............................................. 19

3.      Defendants Have Used the Penalty Clause and Right of First Refusal to Interfere with the Debtor's Ability to Assign Its Assets................................................ 23

B.      There Are Material Facts at Issue Indicating That Defendants' Demand Letters and Purported Notices of Default Were Designed to Coerce and Harass the Debtor........... 24

1.      The Utility Demands Violate the Automatic Stay. ......... 25

2.      The Roof Demands Violate the Automatic Stay............. 26

3.      The Totality of the Demands Constitutes Coercive and Harassing Behavior that Violates the Automatic Stay. ............................................................................. 28

V.      THE DEBTOR'S CLAIM FOR DECLARATORY RELIEF AS TO THE PENALTY CLAUSE IS RIPE FOR ADJUDICATION. ......... 31

A.      Defendants Have Placed the Validity of the Penalty Clause at Issue. .................................................................................. 33

B.      The Ability to Hold the Penalty Clause Unenforceable Is Critical to the Debtor's Efforts to Sell Its Assets........................ 34

C.      The Debtor's Declaratory Relief Is Necessary Because Defendants Have Been Using the Penalty Clause to Threaten and Harass....................................................................... 36

VI.     THE DEBTOR'S CLAIM FOR DECLARATORY RELIEF REGARDING THE CAPITAL CALL IS RIPE FOR ADJUDICATION. ................................................................................. 37

VII.    THE DEBTOR'S CLAIM FOR DECLARATORY RELIEF AS TO THE RIGHT OF FIRST REFUSAL IS NOT BARRED AS A MATTER OF LAW. ............................................................................. 39

1.      Invalidating the Right of First Refusal as to the Debtor Will Not Impose a Significant Economic Detriment on Defendants. ..................................................... 40

2.      The Right of First Refusal Has Severely Impeded the Debtor's Efforts to Market the LP Interest. ............... 41

VIII.   THE DEBTOR'S PENDENT STATE-LAW CLAIMS ARISING FROM DEFENDANTS' INTEREFERENCE WITH THE ASSIGNMENT OF THE LP INTEREST ARE NOT BARRED BY CALIFORNIA'S LITIGATION PRIVILEGE....................................... 43

A.    The Federal Common-Law Litigation Privilege, Not the California Privilege, Applies to the Debtor's Pendent California Contract and Tort Claims.................................. 44

     1.    The Federal Common-Law Litigation Privilege Does Not Shield Defendants' Out-of-Court Statements. ..................................................................... 46

     2.    Application of the Federal Common-Law Litigation Privilege in This Case Is Antithetical to the Purpose of and Policies Underlying That Privilege...................... 48

B.    Even if the California Litigation Privilege Were Applicable, It Would Not Protect Defendants' Statements to Potential Third-Party Buyers. ................................. 48

     1.    There Was No Litigation Pending For the Purposes of Invoking the California Litigation Privilege. ............. 49

     2.    There Are Material Questions of Fact Regarding Whether Defendants Had a "Good Faith" Belief That a Bona fide Dispute Existed at the Time They Made Their Misrepresentations. ..................................... 51

     3.    Defendants' "Publication" to Nonparticipants Is Not Protected by the Litigation Privilege. .............................. 54

IX.    THE DEBTOR'S BREACH CLAIMS BASED UPON MANAGEMENT ACTIONS ARE NOT PROTECTED BY THE BUSINESS JUDGMENT RULE............................................................ 54

X.    THE DEBTOR'S CLAIMS FOR INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE DO NOT FAIL AS A MATTER OF LAW. ........................................................................ 56

A.    Defendants' Economic Interest in the Partnership Does Not Preclude Their Tortiously Interfering With the Debtor's Prospective Economic Advantage in the Sale of Its Interest in the Partnership. ..................................................................... 56

B.    The Debtor Can Show Independently Wrongful Acts to Support Its Prospective Interference Claims................................ 58

C.    There are Issues of Material Fact Concerning Whether Defendants Caused the Debtor to Lose a Prospective Economic Benefit...................................................................... 59

     1.    USB.................................................................................... 59

     2.    KKV ................................................................................... 60

3.    Hilco and McCormick.........................................................63

XI.   THE DEBTOR HEREBY WITHDRAWS ITS CLAIMS FOR
RELIEF AGAINST JENNIFER SCHUH AND ITS SIXTH
CLAIM FOR RELIEF AGAINST ALL DEFENDANTS............................ 64

CONCLUSION............................................................................................... 66

# TABLE OF AUTHORITIES

## CASES

*A.F. Brown Electrical Contractor Inc., v. Rhino Elec. Supply, Inc.,*
   137 Cal. App. 4th 1118 (2006) .................................................................. 52

*Acands, Inc. v. Travelers Casualty & Surety Co. (In re Acands, Inc.),*
   435 F.3d 252 (3d Cir. 2006) ..................................................................... 25

*Algrant v. Evergreen Valley Nurseries Ltd. Partnership,*
   126 F.3d 178 (3d Cir. 1997) ..................................................................... 38

*Am. Products Co., Inc. v. Law Offices of Geller, Stewart & Foley, LLP,*
   134 Cal. App. 4th 1332 (2005) ............................................................ 52, 53

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ................................................................................. 15

*Applied Equipment,*
   7 Cal. 4th 503 (1994) ............................................................................... 57

*Aralac v. Hat Corp. of America,*
   166 F.2d 286 (3d Cir. 1948) ..................................................................... 37

*Barany-Snyder v. Weiner,*
   2007 U.S. Dist. LEXIS 5137 (N.D. Ohio Jan. 24, 2007) ............................. 46

*Berg & Berg Enterprises, LLC v. Boyle,*
   178 Cal. App. 4th 1020 (2009) ................................................................. 55

*Briscoe v. Lahue,*
   460 U.S. 325 (1983) ............................................................................ 46, 48

*BT-I v. Equitable Life Assurance Society,*
   75 Cal. App. 4th 1406 (1999) ................................................................... 15

*Calvert v. Bongards Creameries (In re Schauer),*
   62 B.R. 526 (Bankr. D. Minn. 1986) ......................................................... 42

*Cardinal Indus., Inc. v. Buckeye Federal Savings & Loan Assoc.*
   *(In re Cardinal Indus., Inc.),* 105 B.R. 834 (Bankr. S.D. Ohio 1989) .......... 16

*Cohen v. Pelicano,*
   2005 U.S. Dist. LEXIS 40249 (C.D. Cal. July 12, 2005) ....................... 46, 48

*Combs v. Haddock,*
    190 Cal. App. 2d 151 (1961) ............................................................ 20, 55

*Dommisse v. Napolitano,*
    474 F. Supp. 2d 1121 (D. Ariz. 2007) ........................................ 46

*Edwards v. Centex Real Estate Corp,*
    53 Cal. App. 4th 15 (1997) ............................................................ 52

*Estate of Witlin v. Rio Hodo Associates,*
    83 Cal. App. 3d 167 (1978) .......................................................... 15

*Everest Investors v. McNeil Partners,*
    114 Cal. App. 4th 411 (2003) .......................................... 15, 16, 20

*Exxon Corp. v. Federal Trade Comm'n,*
    588 F.2d 895 (3d Cir. 1978) ........................................................ 38

*G&C Auto Body Inc. v. GEICO Gen. Ins. Co.,*
    552 F. Supp. 2d 1015 (N.D. Cal. 2008) .................................... 57

*Halper v. Halper,*
    164 F.3d 830 (3d Cir. 1999) ........................................................ 45

*Hancock v. Dodson,*
    958 F.2d 1367 (6th Cir. 1992) .................................................... 46

*Hancock v. Hobbs,*
    967 F.2d 462 (11th Cir. 1992) .................................................... 46

*Hinchliffe v. Stubeusz,* 1995 WL 412408
    (Civ. A. No. 95-1991 E.D. Pa. July 6, 1995)............................ 23

*Home Ins. Co. v. Zurich Ins. Co.,*
    96 Cal. App. 4th 17 (2002) .......................................................... 52

*Imbler v. Pachtman,*
    424 U.S. 409 (1976)........................................................................ 48

*In re 48th St. Steakhouse, Inc.,*
    835 F.2d 427 (2d Cir. 1987) ........................................................ 19

*In re Adelphia Comm'ns Corp.,*
    2006 Bankr. LEXIS 975 (Bankr. S.D.N.Y. June 5, 2006)............... 18, 39, 41

*In re Ali Properties, Inc.*,
  334 B.R. 455 (Bankr. D. Kan. 2005) ........................................................................ 27

*In re Baquet*,
  61 B.R. 495 (Bankr. D. Mont. 1986) ........................................................................ 42

*In re Beale*,
  410 B.R. 613 (N.D. Ill. 2009) .................................................................................... 38

*In re Beck Indus., Inc.*,
  605 F.2d 624 (2d Cir. 1979) ...................................................................................... 43

*In re Bialac*,
  712 F.2d 426 (9th Cir. 1983) ..................................................................................... 19

*In re BNT Terminals*,
  125 B.R. 963 (Bankr. N.D. Ill. 1991) ....................................................................... 24

*In re Bobbitt*,
  174 B.R. 548 (Bankr. N.D. Cal. 1993) ...................................................................... 22

*In re Bonner Mall P'ship*,
  2 F.3d 899 (9th Cir. 1993) ......................................................................................... 44

*In re Broadstripe, LLC*,
  402 B.R. 646 (Bankr. D. Del. 2009) .......................................................................... 19

*In re Brooks-Hamilton*,
  348 B.R. 512 (Bankr. N.D. Cal. 2006) ....................................................... 17, 19, 23

*In re Cady*,
  266 B.R. 172 (Bankr. 9th Cir. 2001) ................................................................ 23, 31

*In re Capital Acquisitions & Mgmt. Corp.*,
  341 B.R. 632 (Bankr. N.D. Ill. 2006).......................................................................... 42

*In re Cellnet Data Sys., Inc.*,
  313 B.R. 604 (Bankr. D. Del. 2004) .......................................................................... 27

*In re Cormier*,
  382 B.R. 377 (Bankr. W.D. Mich. 2008)..................................................................... 42

*In re Cumberland Farms, Inc.*,
  162 B.R. 62 (Bankr. D. Mass. 1993) ......................................................................... 19

RLF1 3560650v.1

*In re Cuyahoga Equip.,*
    980 F.2d 110 (2d Cir. 1992) ...................................................................... 45

*In re Davis,*
    312 B.R. 681 (Bankr. D. Nev. 2004) ........................................................ 49

*In re Dill,*
    731 F.2d 629 (9th Cir. 1984) .................................................................... 26

*In re Direct Satellite Communications, Inc.,*
    91 B.R. 5 (Bankr. E.D. Pa. 1988) ............................................................ 45

*In re El Comandante Mgmt. Co., LLC,*
    358 B.R. 1 (Bankr. D.P.R. 2006) ................................................... 17, 19, 21

*In re E-Z Serve Convenience Stores, Inc.,*
    289 B.R. 45 (Bankr. M.D.N.C. 2003) ...................................................... 43

*In re Fleming Cos., Inc.,*
    499 F.3d 300 (3d Cir. 2007) ...................................................................... 40

*In re Gibson,*
    1995 LEXIS 1727 (Bankr. E.D. Va. Aug. 21, 1995) ................................. 42

*In re IT Group, Inc., Co.,*
    302 B.R. 483 (D. Del. 2003) ......................................................... 39, 40, 42

*In re J.F.D. Enters., Inc.,*
    183 B.R. 342 (Bankr. D. Mass. 1995) ...................................................... 19

*In re Joshua Slocum, Ltd.,*
    922 F.2d 1081 (3d Cir. 1990) ............................................................ 39, 40

*In re Kortz,*
    283 B.R. 706 (Bankr. N.D. Ohio 2002) .................................................... 31

*In re Krystal Cadillac Oldsmobile GMC Truck, Inc.,*
    142 F.3d 631 (3d Cir. 1998) ...................................................................... 17

*In re McCabe,*
    345 B.R. 1 (D. Mass 2006) ........................................................................ 38

*In re Mr. Grocer, Inc,*
    77 B.R. 349 (Bankr. D.N.H. 1987) ..................................................... 39, 42

*In re Newport Offshore, Ltd.*,
  88 B.R. 566 (Bankr. D. R.I. 1988) .............................................................. 31

*In re Planned Systems, Inc.*,
  82 B.R. 919 (Bankr. S.D. Ohio 1988) ......................................................... 54

*In re Prudential Lines, Inc.*,
  928 F.2d 565 (2d Cir. 1991) ....................................................................... 19

*In re Sealed Case (Medical Records)*,
  381 F.3d 1205 (D.C. Cir. 2004) .................................................................. 46

*In re Six*,
  190 B.R. 958 (Bankr. M.D. Fla. 1995) ....................................................... 42

*In re Todd*,
  118 B.R. 432 (Bankr. D.S.C. 1989) ............................................................ 42

*In re Winstar Comm'ns, Inc.*,
  554 F.3d 382 (3d Cir. 2009) ....................................................................... 45

*Laffer v. Levinson, Miller, Jacobs & Phillips*,
  34 Cal. App. 4th 117 (1995) ....................................................................... 49

*Laux v. Freed*,
  53 Cal. 2d 512 (1960) ................................................................................. 55

*Lee v. Interinsurance Exchange*,
  50 Cal. App. 4th 694 (1996) ....................................................................... 55

*Lyon v. Whisman*,
  45 F.3d 758 (3d Del. 1995) ......................................................................... 45

*Matter of Garofalo's Finer Foods*,
  186 B.R. 414 (Bankr. N. D. Ill. 1995) ........................................................ 25

*Melamed v. Lake County Nat'l Bank*,
  727 F.2d 1399 (6th Cir. 1984) .................................................................... 45

*Memorial Hosp. v. Shadur*,
  664 F.2d 1058 (7th Cir. 1981) .................................................................... 46

*Morgan Guaranty Trust Co. of New York v.*
  *American Savings and Loan Assoc.*, 804 F.2d 1487 (9th Cir. 1986) ............ 22

*Mull Drilling Co. v. SemCrude, L.P. (In re SemCrude),*
    407 B.R. 82 (Bankr. D. Del. 2009) ........................................................... 32, 33

*Nat'l Rural Telcoms. Coop. v. DIRECTV, Inc.,*
    319 F. Supp. 2d 1059 (C.D. Cal. 2003) ........................................................ 57

*Nilsen v. Neilson (In re Cedar Funding, Inc.),*
    419 B.R. 807 (9th Cir. 2009) ....................................................................... 49

*Pardi v. Kaiser Found. Hosps.,*
    389 F.3d 840 (9th Cir. 2004) ....................................................................... 54

*Pearson v. Miller,*
    211 F.3d 57 (3d Cir. 2000) .......................................................................... 45

*PM Group, Inc. v. Stewart,*
    154 Cal. App. 4th 55 (2007) ........................................................................ 58

*Religious Technology Center v. Wollersheim,*
    971 F.2d 364 (9th Cir. 1992) ................................................................. 45, 46

*Ridgley v. Topa Thrift & Loan Association,*
    17 Cal. 4th 970 (1998) ................................................................................ 32

*Rothman v. Jackson,*
    49 Cal. App. 4th 1134 (1996) ..................................................................... 54

*Sacramento Brewing Co. v. Miller & Desmond,*
    75 Cal. App. 4th 1082 (1999) ..................................................................... 52

*Shafer v. Berger, Kahn, Shafton,*
    *Moss, Figler, Simon & Gladstone,* 107 Cal. App. 4th 54 (2003) ................ 52

*Silberg v. Anderson,*
    50 Cal. 3d 205 (1990) ................................................................ 48, 49, 52, 54

*Steffes v. Stepan Co.,*
    144 F.3d 1070 (7th Cir. 1998) ............................................................ 46, 47, 48

*Toibb v. Radloff,*
    501 U.S. 157 (1991) .................................................................................... 44

*United States v. Fisher-Otis Co.,*
    496 F.2d 1146 (10th Cir. 1974) .................................................................. 32

*Virmani v. Novant Health Incorp.*,
    259 F.3d 284 (4th Cir. 2001) ................................................................. 46

*von Bulow v. von Bulow*,
    811 F.2d 136 (2d Cir. 1987) ................................................................. 46

*Vondrak v. City of Las Cruces*,
    2009 U.S. Dist. LEXIS 42208 (D.N.M. Apr. 8, 2009) ................................................................. 45

*William T. Thompson Co. v. Gen. Nutrition Corp.*,
    671 F.2d 100 (3d Cir. 1982) ................................................................. 46

*Wood v. Cumulus Broad., LLC (In re Wood)*,
    2009 Bankr. LEXIS 2324 (Bankr. E.D. Va. 2009) ................................................................. 49

*Woods v. Fox Broadcasting Sub., Inc.*,
    129 Cal. App. 4th 344 (2005) ................................................................. 57

## STATUTES

11 U.S.C. § 101(5) ................................................................. 26

11 U.S.C. § 362 ................................................................. passim

11 U.S.C. § 365 ................................................................. 33

11 U.S.C. § 365(f)(1) ................................................................. 39

11 U.S.C. § 541(a)(1) ................................................................. 16

11 U.S.C. §§ 101-1532 ................................................................. 4

28 U.S.C. § 157(b) ................................................................. 45

California Civil Code § 47(b)(2) ................................................................. 48

California Corporations Code §§ 15901.10 ................................................................. 20

California Corporations Code §§ 15904.08 ................................................................. 20

## OTHER AUTHORITIES

3 COLLIER ON BANKRUPTCY ¶ 362.03[5][a] (15th ed. rev. 2009) ...................................... 18

## RULES

Federal Rules of Evidence 501 ........................................................................................ 45

Federal Rules of Civil Procedure, Rule 56(c) .................................................................. 14

RLF1 3560650v.1

Gottschalks Inc., a Delaware corporation, as debtor and debtor-in-possession (the "Debtor"), by and through its undersigned counsel, hereby submits this opposition (the "Opposition") to the motion for summary judgment filed by Defendants River Park Properties III ("RPP III"), Lance-Kashian & Co. ("Lance-Kashian"), Jennifer Schuh ("Schuh") and Edward Kashian ("Kashian," together with RPP III, and Lance-Kashian "Defendants"). In support of this Opposition, the Debtor files herewith (i) the *Affidavit of J. Gregory Ambro in Support of the Debtor and Debtor-In-Possession's Opposition to Defendants' Motion for Summary Judgment* (the "Ambro Affidavit"); and (ii) the *Declaration of Justine M. Daniels in Support of the Debtor and Debtor-In-Possession's Opposition to Defendants' Motion for Summary Judgment* (the "Daniels Declaration") and the exhibits attached thereto.[2] The Debtor respectfully submits as follows:

## INTRODUCTION

This case is about Defendants' deliberate efforts—acting mainly through Kashian—to interfere with the sale of the Debtor's limited partnership interest in a major office building in Fresno, California, and acquire the partnership interest for free. Kashian controls the entity, RPP III, that is the general partner and majority owner of the partnership, in which the Debtor holds a 36% interest and from which the Debtor leases substantial space for what was its corporate headquarters. As shown by the evidence filed by the Debtor in opposition to Defendants' summary judgment motion, Kashian made material misrepresentations to one interested buyer that caused the buyer to withdraw its purchase offer and—either directly or through his agents—has spread misinformation in the Fresno community to undermine the marketability of the asset. Kashian, through his representatives, has sent numerous demand letters and purported notices of default to the Debtor for the purposes of coercing payment of pre-petition amounts and causing the Debtor to breach the lease, thus triggering the nearly complete

---

[2] Unless otherwise indicated all exhibits submitted herewith are attached to the Daniels Declaration.

dilution of the Debtor's partnership interest under an obsolete penalty clause in the partnership agreement. Kashian openly vowed that he would not bid against himself and then sought to drive away other bidders to force the Debtor to turn over the partnership interest for nothing.

The sheer length of Defendants' summary judgment brief speaks volumes about the factually-intensive nature of this dispute. Although Kashian vociferously denies the Debtor's factual assertions, there are clearly factual issues about whether his statements were false or misleading, his intent in making those statements and bombarding the Debtor with demand letters and default notices, and the effect of his statements and acts on the Debtor's ability to achieve a fair market price for its largest remaining asset. There are also factual issues about whether certain provisions in the partnership agreement, which Kashian has exploited to discourage buyers, should be invalidated.

The propriety of Defendants' conduct must be viewed through the lens of the duties Defendants owe to the Debtor as a limited partner and an entity in bankruptcy. General partners are bound by their duties as fiduciaries to act in the highest good faith towards their limited partners and to refrain from taking advantage of them. Defendants must also scrupulously obey the automatic stay barring against any acts to control or interfere with the Debtor's assets. The evidence reveals a pattern of behavior through which Defendants have flouted the obligations imposed by both their fiduciary duties and the automatic stay. Defendants invoke the litigation privilege and other legal defenses but, as shown below, these defenses cannot shield Defendants from responsibility for their wrongful conduct.

At the trial set for May 21, 2010, the Debtor is seeking an order enjoining further violations of the automatic stay, a declaration removing certain contractual obstacles to the sale of the Debtor's partnership interest, and findings that Defendants are liable for breach of fiduciary duties, violations of the automatic stay, and certain other claims. Defendants cannot show that there are no genuine issues of material fact. Accordingly,

2

Defendants' summary judgment motion should be denied and they should face trial.

I.   **GENERAL BACKGROUND.**

A.   **The Debtor's Limited Partnership and Lease With Defendants**

Founded in 1904, the Debtor was a diversified retailer headquartered in Fresno, California that operated 58 full-line department stores and three specialty stores in California and other western states under the "Gottschalks" and "Village East" names.[3] In March 1990, the Debtor and River Park Properties I ("RPP I") entered into a limited partnership agreement (as amended from time to time, the "LP Agreement"), creating Park 41 Limited Partnership ("Park 41"), to develop an office building with approximately 180,000 square feet of space at 7 River Park Place East, Fresno, California (the "Park View Plaza").[4] RPP I contributed the land, and the Debtor contributed over $5 million for design and construction costs. Defendant RPP III, as successor-in-interest to RPP I, is the general partner of Park 41 and owns 64% of the limited partnership. The Debtor is the limited partner and owns the remaining 36% (the "LP Interest").[5]

Park 41, as successor-in-interest to River Park Properties, is also the current lessor pursuant to that certain Office Building Lease between the Debtor and River Park Properties, dated March 16, 1990 (as amended from time to time, the "Lease").[6] The Debtor leases approximately 88,000 square feet of the building (the "Space") at rent substantially below market and has maintained its corporate headquarters in Park View Plaza since 1991.[7]

Defendant Lance-Kashian is the general partner of RPP III. Defendant Kashian

---

[3] Ambro Affidavit ¶ 4.

[4] Ex. 1, the LP Agreement.

[5] *See id.* ¶ 5.

[6] *See* Ex. 2, the Lease.

[7] *See id.*.

3

is the chief executive officer and managing director of Lance-Kashian. Defendant Schuh

is the former co-chief executive officer of Lance-Kashian and Kashian's daughter.[8]

Kashian controls Lance-Kashian, RPP III, and Park 41; he is intimately involved in

running all aspects of Lance-Kashian, its affiliated entities, and related properties.[9]

Kashian, acting for himself and on behalf of Lance-Kashian and RPP III, is responsible

for the wrongful acts alleged in the Debtor's Complaint and the Motion.[10]

B. **The Debtor's Bankruptcy and Efforts to Market Its LP Interest and Lease**

On January 14, 2009 (the "Petition Date"), the Debtor filed its voluntary petition

for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532

(the "Bankruptcy Code") in the United States Bankruptcy Court for the District of

Delaware. The Debtor began to liquidate its assets at an auction of its inventory on

March 30, 2009 and assumed the Lease on August 12, 2009.

The Debtor is winding down its affairs. To liquidate its assets and maximize the

value of its estate, the Debtor has been actively seeking assignees for the LP Interest and

the Lease.[11] Sale of the LP Interest—valued at $4.6 million[12]—could significantly benefit

the Debtor's estate. Assigning the Lease would also save the estate approximately

$92,000 per month mainly in rent and common-area maintenance charges ("CAM")

(collectively, the "Carrying Costs").[13] The Debtor has retained two brokerage firms to

---

[8] Ex. 58, January 22, 2010 Deposition of Jennifer Schuh ("Schuh Deposition") at 16:1-9, 54:19-55:2.

[9] *See, e.g.*, Ex. 51, January 21, 2009 Deposition of Sherman Dix ("Dix Deposition") at 14:22-15:13, 18:15-24, 23:6-24.

[10] The Debtor originally brought suit against Schuh based on her capacity as CEO of Lance-Kashian. However, Schuh appears to be merely an unwitting instrument of Kashian. *See, e.g.*, Ex. 58, Schuh Deposition at 58:5-9. As discussed below in Section XI, the Debtor does not oppose dismissal of its claims against Schuh.

[11] Ambro Affidavit ¶ 8.

[12] *See* Ex. 45, February 16, 2010 Expert Report of Debtor's expert Michael J. VanderLey (the "VanderLey Report") at 7, 20-23.

[13] Ambro Affidavit ¶ 9.

market these assets: national broker DJM Realty, LLC ("DJM") and local Fresno broker Colliers Tingey International ("CTI"). Assignment of the LP Interest and the Lease continues to be one of the Debtor's top priorities.

Even in the current economic climate, Park View Plaza is a very attractive prospect for both investors and tenants. As CTI lead broker Robert Fena testified:

> [F]irst of all, it's a Class A office building, one of the best buildings in the market. It has advanced energy management systems built into it. It's an excellent location, it's got good parking, easy access and it's in one of the—in actually the fastest growing and hottest office market[s] in the metro area.[14]

Additionally, the assignee of the Lease would enjoy substantially below-market rent until October 2011, with two ten-year renewal options at 90% of the prevailing fair market rent.[15]

### C. Defendants' Wrongful Interference With the Debtor's Efforts to Assign the LP Agreement and Lease

Since the Debtor declared bankruptcy, Kashian has shown great interest in acquiring the LP Interest and taking back the space subject to the Lease. Shortly after the Debtor began liquidating, Kashian told the bank that holds the mortgage on Park View Plaza, "I plan on buying back my lease."[16] A month later, Kashian told another tenant of Park View Plaza that he was "trying to buy Gottschalks' 36% interest in the building . . . ."[17] Even now, Kashian does not deny being interested in the Debtor's assets:

> Q. After the Gottschalks' bankruptcy was announced, did you form an interest in acquiring Gottschalks' limited partnership interest in Park 41?

---

[14] Ex. 52, January 29, 2010 Deposition of Robert Fena ("Fena Deposition") at 100:9-21; *see also id.* at 116:7-22; Ex. 49, Deposition of Kenneth Baldwin ("Baldwin Deposition") at 46:23-47:23.

[15] *See* Ex. 52, Fena Deposition at 103:16-104:3.

[16] *See* Ex. 12, March 31, 2009 E-mail from Kashian to Linda M. Gallagher of Bank of America.

[17] Ex. 16, May 15, 2009 Memorandum by Baldwin and Lhoussaine Ouassou ("May 15 Memorandum").

A. Did I have a prior interest? I always had an interest. I didn't just acquire it. During this bankruptcy I've been monitoring proceedings all the way along. Yes.

Q. Well, in connection with—when you learned that Gottschalk's had acquired -- had filed for bankruptcy, did you become interested in acquiring its limited partnership interest?

A. Did I—yes. Yes. The answer is yes.[18]

Notwithstanding his clear interest in the Debtor's assets, Kashian has never made an offer for them. He vowed that he would not "bid against" himself.[19] Instead, Kashian—acting individually and through the other Defendants—made material misrepresentations to a legitimate potential investor and poisoned the market with misinformation. Kashian has driven away potential buyers because he seeks to acquire the LP Interest and Lease without paying fair consideration.

        1.    *Kashian Deliberately Drove Away an Interested Buyer.*

On September 11, 2009, Kings Knight Ventures LLC ("KKV") made an offer of $2 million to the Debtor for its LP Interest and Lease.[20] At a subsequent face-to-face meeting held at Kashian's request on or about September 17, 2009, Kashian made the following misrepresentations to KKV principal Hanno Powell:

- There will be significant increases in CAM charges, which KKV would have to bear as the assignee of the Debtor's Lease, along with the costs of retenanting the Debtor's former space;[21]

- There was a serious risk of significant vacancies from non-renewal of leases;[22] and

---

[18] Ex. 56, February 3, 2009 Deposition of Edward Kashian ("Kashian Deposition") at 74:6-17.

[19] *See, e.g.,* Ex. 5, February 23, 2009 E-mail from Michael Wilhelm ("Wilhelm") to J. Gregory Ambro ("Ambro").

[20] Ex. 27, September 11, 2009 Letter of Intent from KKV to the Debtor (the "September 11 KKV LOI").

[21] Ex. 57, February 2, 2010 Deposition of Hanno Powell ("Powell Deposition") at 118:21-123:17.

[22] *Id.* at 117:8-118:20.

- There will be an imminent $8 million cash call for tenant improvements.[23]

In response to this litany of investment horrors, KKV withdrew its offer.[24]

Kashian's representations to KKV were inconsistent with his past statements and cannot be squared with the facts.[25]  For example, in the course of lease-renewal negotiations, Kashian advised representatives of the McCormick law firm—the other major tenant in Park View Plaza—that he "was very confident that [Park View Plaza's] CAM charges [would] not increase despite of [sic] Gottschalks' departure."[26]  During the same meeting, Kashian also told McCormick that he was "about 80% done with a major tenant [Bank of America] to take 50,000 sq ft of the 80,000 sq ft."[27]  Securing new tenants for the building was critical to investors, yet this material fact was concealed by Kashian from KKV as well as the Debtor.

Despite his fiduciary duty to accurately represent the financial condition of the partnership, Kashian admits that he performed no investigation and had no concrete basis for his assertion that there would be an $8 million capital call.[28]  Indeed, this figure far exceeds even the estimate of Defendants' own expert witness, Thomas E. Kabat ("Kabat"), who projected the need for capital calls totaling $3.5 million, less than half of the amount quoted by Kashian.[29]  Far from being imminent, in Kabat's "worst-case" scenario—where all tenants vacated Park View Plaza—the capital calls would not occur

---

[23] *Id.* at 115:25-116:16.

[24] Ex. 34, October 8, 2009 E-mail from Powell to Jim Famalette et al (the "October 8 KKV Withdrawal E-mail").

[25] In addition to KKV, three other entities United Security Bank ("USB"), Hilco Real Estate Enterprises ("Hilco"), and McCormick, Barstow, Sheppard, Wayte & Carruth, LLP ("McCormick") have displayed varying levels of interest in acquiring the Debtor's assets.

[26] Ex. 16, May 15 Memorandum.

[27] *Id.*

[28] Ex. 56 Kashian Deposition 277:15-278:4.

[29] *See* Ex. 46, Expert Report of Thomas E. Kabat, MAI, CRE dated March 11, 2010 ("Kabat Report"), Appendix I.  The Debtor disputes these projections and believes the maximum capital call required will be closer to $1.8 million.  *See* Ex. 45, VanderLey Report at 8-9, 29-32.

7

until February of 2012 and would be spread over the course of four years.[30]

In flagrant disregard of his fiduciary duties to Debtor as limited partner and despite his knowledge of the automatic stay's barring interference with the Debtor's property, Kashian purposefully painted a negative and misleading picture of the LP Interest in order to induce KKV to withdraw its offer.

### 2. *Kashian Poisoned the Market.*

In addition to driving KKV away, Kashian took affirmative steps to dissuade other potential bidders. Robert Fena, one of the Debtor's brokers, discovered that Kashian's misrepresentations regarding the capital call had infected the market:

> The Managing General Partner (MP) [Kashian] has spoken to a few of the interest[ed] parties because they know him and have called him about the property and [the] situation, and he's succeeded in raising concerns about the bldg [sic] having to prepare for a future cash call, for re-tenanting costs, when G's [the Debtor's] lease expires in Oct. 2011. Numbers in the $5-8 million range are being thrown out, and this makes people nervous.[31]

The figures Fena reported match Kashian's statements to KKV regarding the size of the capital call; a projection given by Kashian to another bidder, Hilco, showing capital cost projections of $5.5 million over the next two years; and Defendants' interrogatory responses.[32]

Moreover, when Fena asked Kashian about his interest in acquiring the LP Interest and Lease, Kashian responded that Fena "was wasting [his] time on marketing the property because [Kashian] was going to end up with the property."[33] Fena further

---

[30] *See* Ex. 46, Kabat Report, Appendix I.

[31] Ex. 38, October 27, 2009 E-mail from Bobby Fena to Ambro ("October 27 E-mail").

[32] *See,* Ex. 34, October 8 KKV Withdrawal E-Mail; Ex. 48, Schedule Provided to Hilco; Ex. 44, Respondents' Objections and Answers to Gottschalks Inc.'s First and Second Set of Interrogatories to Respondents dated January 13, 2010 ("Defendants' Interrogatory Responses"), Interrogatory No. 15 at 10. In their interrogatory responses, Defendants stated that tenant-improvement allowances for Fresno "range between $50 and $90 per square foot" or approximately $4.4 to $7.9 million when applied to the Debtor's 88,000 square foot space. In actuality the range is $5 to $50. *See* Ex. 45, VanderLey Report at 28.

[33] *See* Ex. 52, Fena Deposition Vol. I at 64:9-65:10; 105:14-107:15.

testified that rumors regarding Kashian's intention to take the Debtor's assets were prevalent in the Fresno market and adversely impacted his efforts to find a buyer.[34] At trial, the Debtor's expert will testify to the adverse impact such statements would likely have on the Debtor's marketing efforts.[35]

### D. The Penalty Clause, Right of First Refusal, and Threat of an Exorbitant Capital Call Have Stymied the Debtor's Efforts to Assign Its LP Interest and Lease.

The rumor that the Debtor's assets will go to Kashian stems in part from his deliberate public exploitation of certain provisions of the LP Agreement. These provisions include: Section 3.04, "Material Default by the Limited Partner in its Lease" (the "Penalty Clause"); portions of Section 7.04, "Right of First Refusal" (the "Right of First Refusal"); and Section 4.04, "Cash Deficits After Anniversary Date of Completion," which authorizes the use of capital calls. Not only are the Penalty Clause and Right of First Refusal unenforceable, but even if they were, Kashian has crossed the line through his concerted attempts to use them to scare off buyers. The Debtor seeks a declaration that those clauses are invalid and that there is no reasonable basis for his claimed need for an imminent and enormous capital call.

### 1. *The Penalty Clause*

As discussed above, Kashian has openly stated that he will be able to acquire both the Debtor's LP Interest and Lease without providing any consideration to the Debtor's estate. He made similar statements to Kenneth Baldwin ("Baldwin") of McCormick in April of 2009 when they met to discuss the renewal of McCormick's lease:

> Q. Do you recall the nature of that conversation, what was discussed?
> A. Well, he was pretty confident he was going to get the space back.
> Q. What was the basis for his confidence?

---

[34] *See id.* at 68:22-69:19; Ex. 53, Fena Deposition Vol. II at 185:17-186:11.

[35] *See, e.g.,* Ex. 45, VanderLey Report at 40.

A. He didn't say. He was pretty confident he was going to get the space back.

Q. Did he say he was confident about getting the space back in relation to the penalty clause?

A. You know, I don't know if he had intentionally connected to the two but the discussion was—they were connected. I don't know if it was intentional but he was pretty confident he would get the space back, and he had mentioned about the lease forfeiture, about the reduction in the percentage, and he also mentioned his right of first refusal.[36]

The source of Kashian's confidence is Section 3.04 of the LP Agreement, the Penalty Clause, which provides that the Debtor's Interest will be reduced from 36% to 1% in the event of any default on the Lease. Kashian has raised the specter of the Penalty Clause on multiple occasions with the Debtor, as well as its counsel, brokers, and potential assignees.[37] Through Kashian's efforts, this provision has become a source of concern for virtually all of the Debtor's potential buyers.[38]

Compounding the problem, Kashian has spread the word that the LP Interest itself is worthless due to the Penalty Clause. Kashian's counsel represented to Jerbich, then the Debtor's broker, that, as a result of declaring bankruptcy, the Debtor was already in default and the LP Interest had already been reduced to 1% pursuant to the terms of the LP Agreement.[39] One of the Debtor's potential assignees recently expressed concern about buying the LP Interest because he had heard the same story floating around the Fresno market.[40]

---

[36] Ex. 49, Baldwin Deposition at 74:10-75:9; *see also id.* at 110:10-111:21.

[37] *See e.g. id.;* Ex. 59, January 21, 2009 Deposition of Dennis Woods ("Woods Deposition") at 18:27-19:3; Ex. 7, March 16, 2009 E-mail from Wilhelm to Rinehart ("March 16 E-mail"); Ex. 8, March 17, 2009 E-mail from Wilhelm to Jerbich (the "March 17 E-mail"); Ex. 11, March 23, 2009 E-mail from Wilhelm to Rinehart ("March 23 E-mail").

[38] Ex. 52, Fena Deposition Vol. I at 128:16-23; Powell Deposition at 95:20-96:2; *see also* Ex. 50, February 4, 2010 Deposition of Matthew Darin of Hilco Real Estate ("Darrin Deposition") at 49:22-50:16.

[39] Ex. 54, February 5, 2010 Deposition of Michael Anthony Jerbich ("Jerbich Deposition") at 13:25-15:4.

[40] Ambro Affidavit ¶ 11.

RLF1 3560650v.1

## 2. *The Right of First Refusal*

The Debtor's brokers testified that the Right of First Refusal, which gives Defendant RPP III the right to match any bid made by a potential assignee for the LP Interest, has impaired their ability to market the Debtor's LP Interest because potential buyers are reticent to invest the time and funds necessary to acquire the Debtor's assets only to have Kashian swoop in and take those interests for the same amount of consideration.[41] Potential buyers have expressed similar concerns.[42] Kashian's misrepresentations about the LP Interest have exacerbated the problem. The Debtor's expert—who has extensive experience valuing, buying, and selling commercial real estate—has concluded that the right of first refusal is materially interfering with the sale process.[43]

## 3. *The Capital Call*

As discussed above, both Powell and Fena testified that Kashian has stated that he intends to make a capital call for as much as $8 million.[44] Like the Penalty Clause and the Right of First Refusal, the threat of an impending capital call has driven away potential buyers.[45] This amount is dramatically inflated.[46] Moreover, any such capital call, if it were actually made, could be the final blow, forcing the Debtor to abandon the LP Interest in the face of increasing pressure created by Kashian for that very purpose.[47] The threat that Kashian would make an unwarranted capital call is real, as Debtor

---

[41] *See* Ex. 53, Fena Deposition Vol. II at 30:8-16.

[42] *See* Ex. 49, Baldwin Deposition at 24:16-25:10; Ex. 57 Powell Deposition at 127:7-13.

[43] *See* Ex. 45, VanderLey Report at 10-11.

[44] *See* Ex. 34, October 8 KKV Withdrawal Email; Ex. 38 October 27 E-Mail.

[45] *Id.*

[46] Ex. 45, VanderLey Report at 8-9; *see also* Ex. 46, Kabat Report, Appendix I.

[47] Ambro Affidavit ¶ 18.

11

recently discovered notes from Kashian's litigation expert showing that Kashian intends to make a capital call within the next three months.[48]

E.  **Defendants' Other Efforts to Squeeze Out the Debtor**

Since the Petition Date, Defendants—either directly, through Park 41, or by and through their counsel—have sent no less than 11 post-petition demands and purported notices of default to the Debtor, its counsel, and/or its broker:

> March 16 – A demand for approximately $25,000 for pre-petition utility charges, including a threat of default[49]
>
> March 17 – A second demand for approximately $25,000 for pre-petition utility charges, including a threat of default[50]
>
> March 23 – A third demand for approximately $25,000 for pre-petition utility charges, a including a threat of default[51]
>
> April 14 – A demand for "as-built" drawings of the leased premises[52]
>
> May 18 – A threatened default for selling [office fixtures] from the leased premises[53]
>
> July 29 – A threatened default for selling merchandise from the leased premises[54]
>
> August 27 – A demand for approximately $31,000 for a pro rata share of the cost of recoating Park View Plaza roof[55]
>
> October 5 – A second demand for approximately $31,000 for a pro rata share of the replacement of the Park View Plaza roof's membrane[56]
>
> October 8 – A demand for additional insurance over the primary coverage for the Space leased premises[57]

---

[48] *See* Ex. 47, Kabat Hand Written Notes; *see also* Ex. 55, Kabat Deposition at 264:1-15.

[49] Ex. 7, March 16 E-mail.

[50] Ex. 8, March 17, 2009 E-mail.

[51] Ex. 11, March 23, 2009 E-mail.

[52] Ex. 14, April 14, 2009 E-mail from Wilhelm to Rinehart (the "April 14 E-mail").

[53] Ex. 17, May 18, 2009 Redacted E-mail from Carol Aurand to Collins@rlf.com et. al (the "May 18 E-mail").

[54] Ex. 21, July 29, 2009 Redacted E-mail from Wilhelm to Rinehart (the "July 29 E-mail").

[55] Ex. 25, August 27, 2009 Letter from Park 41 to the Debtor (the "August 27 Letter")

[56] Ex. 33, October 5, 2009 Letter from Park 41 to the Debtor (the "October 5 Letter").

October 14 – A third demand for approximately $31,000 for a pro rata share of the replacement of the Park View Plaza roof's membrane[58]

December 22 – A demand for over $62,000 for landscaping[59]

Defendants issued these demands and purported defaults with full knowledge of the pendency of the Debtor's bankruptcy case, and after having received notice from the Court specifically stating that creditors are prohibited from "contacting a debtor to demand repayment."[60]

The intent of Defendants' demands and purported notices of default must be understood in light of the Penalty Clause, under which any default, no matter how minor, can trigger the reduction of the Debtor's LP Interest to 1%. Not coincidentally, in March 2009, when the communications regarding the pre-petition utility charges (the "Utility Demands")[61] were being issued, Kashian made handwritten notes to discuss with his advisors including: "why would I buy out interest in office building" and "check out partnership paper—if default on lease—partnership interest from 36% to 1%? must be enforceable."[62] Kashian evidently is planning to seize control, not by purchasing the assets for fair value, but by creating disputes and leveraging a putative default into the nearly complete dilution of the Debtor's interest.[63]

Kashian has also deliberately and improperly increased the Debtor's costs to carry the Lease in an attempt to cause the Debtor to relinquish the LP Interest. Just after the

---

[57] Ex. 35, October 8, 2009 (the "October 8 Letter").

[58] Ex. 36, October 14, 2009 Letter from Park View Plaza to Gottschalks (the "October 14 Letter").

[59] Ex. 43, December 22, 2009 Redacted E-mail from Malaky to Famalette, et al. (the "December 22 E-mail"). Subsequently the landscaping charge was rescinded. Kashian testified that he rescinded the landscaping charges in response to the Debtor's suit. However, Kashian further testified that he simply intends to place the landscaping charges in the CAM for 2010. *See* Ex. 56 Kashian's Deposition at 263:3-17.

[60] Ex. 4, February 6, 2009 E-mail from Horton to Wilhelm.

[61] Ex. 7, March 16 E-mail.

[62] Ex. 9, Handwritten Notes dated March 20, 2009.

[63] *See id.*

13

Debtor assumed the Lease in August 2009, Kashian began putting in extensive new landscaping at a cost in excess of $100,000. Every deponent questioned on the matter, except Kashian, agrees that the flowers and other new landscaping were unnecessary because the former landscaping was visually appealing and in keeping with the standards for a Class A building.[64] Kashian's ability to impose such unnecessary costs on the Debtor, which is obligated to pay 50% of CAM charges, was his way of exerting control and sending a message.

To the same end, on November 5, 2009, the Debtor received a letter from Defendants stating that all partnership distributions for the quarters ending September 30 and December 31, 2009 would be withheld (the "November 5 Letter").[65] The Debtor is entitled to receive distributions from Park 41 of any excess operating cash flow. The Debtor's share of the distributions is in proportion to its 36% ownership interest in Park 41 and, until the third quarter of 2009, was approximately $36,000 per month (the "Distributions"). Since November 5, the Debtor has not received any distributions. The November 5 Letter references a document that justified the complete cessation of distributions ("Schedule 1"). Despite the Debtor's multiple requests, Defendants never produced a copy of Schedule 1.[66] They now claim that this schedule never existed.[67] The timing of the unjustified cessation of distributions was no coincidence, as it was the latest salvo in Kashian's campaign to squeeze out the Debtor.

## II.    **STANDARD FOR SUMMARY JUDGMENT.**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary

---

[64] *See, e.g.,* Ex. 58, Schuh Deposition at 79:18-21; Ex. 52, Fena Deposition Vol. 1 at 101:9-102:4; Ex. 49, Baldwin Deposition at 106:1-107:7.

[65] Ex. 39, November 5, 2009 Letter from Edward Kashian to Jim Famalette, et al. ("November 5 Letter").

[66] *See e.g.* Ex. 40, Redacted November 9, 2009 E-Mail from Jora Malaky to Ambro; Ex. 41, Letter from Ambro to Dix.

[67] Ex. 51, Dix Deposition at 110:12-111:16.

judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Further, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 252, 255. Rule 56 does not permit summary judgment as a matter of law where "the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id.* at 248.

III. **DEFENDANTS HAVE WILLFULLY VIOLATED THEIR FIDUCIARY DUTIES TO THE DEBTOR.**

As the Debtor's general partner, RPP III—and by extension Lance-Kashian and Kashian—are "bound to act in the highest good faith . . . and may not obtain any advantage over [the Debtor] . . . by the slightest misrepresentation, concealment, threat, or adverse pressure of any kind." *Everest Investors v. McNeil Partners*, 114 Cal. App. 4th 411, 424 (2003) (denying summary judgment on limited partner's claims for breach of fiduciary duty) *citing BT-I v. Equitable Life Assurance Society*, 75 Cal. App. 4th 1406 (1999) (holding the purchase and foreclosure of partnership debt by a general partner is a breach of fiduciary duty); *see also Estate of Witlin v. Rio Hodo Associates*, 83 Cal. App. 3d 167, 175-176, (1978) (holding partners have a fiduciary obligation to make "a full and fair disclosure of all matters substantially affecting the fair market value of the partnership"). Despite these fiduciary duties, Kashian has pursued his own economic interests at the Debtor's expense. Rather than support the Debtor in its attempt to sell the LP Interest and maximize its value for the estate, Kashian:

- Drove away KKV through misrepresentations about the status and value of the partnership;

- Spread false information in the market to ensure there would be no other bidders;

- Imposed unreasonable expenses on the Debtor and cut off its distributions; and

- Harassed the Debtor with claimed defaults and a threatened reduction of its interest under the Penalty Clause.

Defendants—not the Debtor—bear the burden of proof in justifying their principal's self-serving actions. *Everest Investors*, 114 Cal. App. 4th at 424 ("Thus, a partner who seeks a business advantage over another partner bears the burden of showing complete good faith and fairness to the other.").

Notably, Defendants never address, let alone deny, that they are bound by their fiduciary duties to the Debtor. They attempt to circumvent the Debtor's claims for breach of fiduciary duty by arguing that their conduct, even if unlawful, was shielded by California's litigation privilege. As discussed below in Section VIII, the California litigation privilege is not applicable, and Defendants must answer for their conduct on the merits.

IV. **THERE ARE ISSUES OF MATERIAL FACT REGARDING THE DEBTOR'S CLAIM THAT DEFENDANTS VIOLATED THE AUTOMATIC STAY.**

Defendants do not contest that the LP Interest and Lease are property of the Debtor's bankruptcy estate. *See, e.g.*, 11 U.S.C. § 541(a)(1) and (7); *Cardinal Indus., Inc. v. Buckeye Federal Savings & Loan Assoc. (In re Cardinal Indus., Inc.)*, 105 B.R. 834, 848 (Bankr. S.D. Ohio 1989) ("It is further undisputed that whatever legal or equitable interests a general partner has in a partnership become part of that partner's bankruptcy estate under 11 U.S.C. § 541(a)"). Hence, these assets are protected by the automatic stay in Section 362(a) of the Bankruptcy Code. As explained by the Third Circuit:

> The *automatic stay is one of the fundamental debtor protections* provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. *It stops all collection efforts, all harassment, and all foreclosure actions.* It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

*In re Krystal Cadillac Oldsmobile GMC Truck, Inc.*, 142 F.3d 631, 637 (3d Cir. 1998) (emphasis added).

Since the Petition Date, Defendants (1) wrongfully interfered with the Debtor's efforts to assign its LP Interest and Lease and (2) issued nearly a dozen demands and default notices, as well as suspended the Debtor's distributions, all for the purpose of squeezing out the Debtor. These actions violate the automatic stay which bars against "any action to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).

A.   **There Are Material Facts At Issue Regarding the Debtor's Claim That Defendants Interfered With the Debtor's Efforts to Assign Its Interest in the Limited Partnership and Lease.**

To drive away potential bidders, Kashian made material misrepresentations and spread misinformation, particularly regarding the amount and timing of the capital call, and exploited the existence of the Right of First Refusal and Penalty Clause to degrade the value of the Debtor's assets.[68] These actions violate the automatic stay. *See, e.g., In re Brooks-Hamilton*, 348 B.R. 512, 525 (Bankr. N.D. Cal. 2006) (holding that acts which "create[] a cloud on title and interfere[] with a bankruptcy trustee's attempt to sell the real property, perhaps, even reducing the sale price . . . qualif[y] as the exercise of control over the real property"); *In re El Comandante Mgmt. Co., LLC*, 358 B.R. 1 (Bankr. D.P.R. 2006) (holding that dismissal of debtor's complaint for violation of the automatic stay was inappropriate where complaint alleged that statements by the government regarding its consideration to exercise eminent domain over debtor's property adversely

---

[68] *See* Sections I(D)(1) and I(D)(2), *supra*.

affected or decreased the value of the debtor's estate).

Defendants argue that (1) interference with efforts to assign the property of the estate does not constitute a violation of the stay and (2) their actions do not even constitute interference. (*See* Opening Brief at 22-27.) The first argument is contradicted by bankruptcy law and the second ignores the contrary facts in this case. As detailed below, both arguments fail, making summary judgment inappropriate.

    1.    *Bankruptcy Courts Have Consistently Recognized That Interference With the Debtor's Efforts to Assign Its Property Constitutes a Violation of the Automatic Stay.*

Defendants state that the Debtor rests its interference claim on the "novel theory" that any interference in the Debtor's ability to assign its assets constitutes a violation of the stay. Far from being novel, the Debtor's contentions are well supported by case law interpreting Bankruptcy Code Section 362(a)(3). It is well-established that interference is actionable as a violation of the automatic stay. *In re Adelphia Comm'ns Corp.*, 2006 Bankr. LEXIS 975 at *8 (Bankr. S.D.N.Y. June 5, 2006) (state court action to enjoin sale of debtor's property under an anti-trust theory violated the automatic stay because Section 362(a)(3) "*prohibits interference with disposition of assets that are under the Court's wing*") (emphasis added); 3 COLLIER ON BANKRUPTCY ¶ 362.03[5][a] (15th ed. rev. 2009) ("Executory contracts and leases are considered a form of property of the estate. As property of the estate, the debtor's interests in such contracts or leases are protected against termination or other interference that would have the effect of removing or *hindering the debtor's rights* in violation of Section 362(a)(3).") (emphasis added).

Contrary to Defendants' argument, Section 362(a)(3) does not require that an attempt to exercise control over a debtor's property arise through the use of judicial process.[69] Bankruptcy courts commonly find that Section 362(a)(3) has been violated

---

[69] In fact, conditions requiring a violation of the automatic stay to concern the use of judicial process are detailed in several other subsections of Section 362, but not in Section 362(a)(3). *See* 11 U.S.C. § 362(a)(1) (commencing judicial or administrative action); (a)(2) (enforcing a judgment); (a)(8) (tax

based on facts that have little to do with the exercise of legal process.[70] The protection of Section 362(a)(3) is so strong that it can even enjoin actions by creditors against *non-debtors* that impact property of a debtor's estate.[71]

Defendants should be held to have violated the automatic stay if it is found that their actions have deliberately or wrongfully interfered with the Debtor's ability to assign or reduced the value of the LP Interest or Lease. The evidence warrants such a finding.

2.   *Defendants' Misrepresentations and Poisoning of the Market Have Interfered with the Debtor's Ability to Assign Its Assets.*

The evidence shows that KKV, one of the Debtor's most promising potential buyers, withdrew from purchasing the Debtor's LP Interest and Lease after meeting with Kashian on or about September 17. At that meeting Kashian represented to KKV's principal, Hanno Powell, that there would be significant increases in CAM charges, a significant risk of vacancies due to non-renewal of existing leases, and an imminent $8 million capital call for tenant improvements. These statements were lies intended to

---

proceedings before the U.S. Tax Court). Congress knew how to limit Section 362(a)(3) to attempts to exercise control through the use of judicial process if that were its intent. Congress did not do so.

[70] *See e.g., El Comandante*, 358 B.R. 1 (publication of government's plans to potentially take debtor's property through eminent domain may violate stay as it adversely affects the value of the debtor's estate); *In re J.F.D. Enters., Inc.*, 183 B.R. 342 (Bankr. D. Mass. 1995) (state beverage control commission violated Section 362(a)(3) when it refused to approve the debtor's sale of its liquor license unless the buyer of the license was placed on the commission's "delinquency list"); *In re Broadstripe, LLC*, 402 B.R. 646, 657 (Bankr. D. Del. 2009) (cooperative's refusal to perform its obligations to a debtor under an executory cooperative member agreement before debtor assumed or rejected the agreement violated the automatic stay, as the cooperative was interfering with the debtor's property interests); *In re Cumberland Farms, Inc.*, 162 B.R. 62 (Bankr. D. Mass. 1993) (Section 362(a)(3) prohibited non-debtor from auctioning off stock in Debtor subchapter S corporation to enforce judgment against non-debtor stockholder when doing so would interfere with Debtor's ability to realize loss carryover tax benefits); *In re Brooks-Hamilton*, 348 B.R. at 535 (recordation of a *lis pendens* creating a cloud on title of property of the estate was an exercise of control in violation of automatic stay).

[71] *In re 48th St. Steakhouse, Inc.*, 835 F.2d 427 (2d Cir. 1987) (landlord violated stay when it took action to terminate non-debtor tenant's restaurant lease, as it affected the debtor subtenant's leasehold interest in the property); *In re Bialac*, 712 F.2d 426, 431-32 (9th Cir. 1983) (foreclosure sale of 5/6 interest in note violated automatic stay because debtor, holding other 1/6 of note, had its right to redeem the other 5/6 interest cut off by the foreclosure sale); *In re Prudential Lines, Inc.*, 928 F.2d 565 (2d Cir. 1991) (parent of bankrupt subsidiary would violate the automatic stay from taking worthless stock deduction because it would destroy debtor's ability to claim net operating loss carry forward which was property of the estate).

induce KKV to withdraw its offer.[72]

The misrepresentation regarding the capital call is particularly egregious. First, Kashian has used similar threats to poison the Fresno market with rumors of a $5 million to $8 million capital call.[73] The risk of a capital call of the magnitude stated by Kashian not only materially decreases the amount a potential buyer would be willing to pay for the Debtor's LP Interest, but also drives away potential buyers unwilling to take such a significant risk.

Second, far from being "the expression of a reasoned opinion" (Opening Brief at 27), Kashian's representation of the amount of the capital call had no legitimate basis. California law requires that Kashian have a good-faith, reasonable basis for this assertion. *See, e.g.,* Cal. Corp. Code §§ 15901.10, 15904.08; *Everest Investors*, 114 Cal. App. 4th at 424; *Page*, 55 Cal. 2d at 196 (1961); *Combs v. Haddock*, 190 Cal. App. 2d 151, 166 (1961) ("The burden of establishing the account is on the trustee, including the burden of showing that any expenditure made was a proper disbursement."). Despite his fiduciary duty to accurately and responsibly represent the financial condition of the partnership, Kashian admits that he performed no investigation and had no concrete basis for his calculation of the potential capital call to fund tenant improvements.[74] Even Defendants' own expert could not support, or even come close to supporting, such an amount. Rather, Kabat found that in all likelihood any future capital call would not exceed a total of $3.5 million dollars.[75]

Third, in the case of KKV's offer, there was no reason to make a capital call at all or to withhold distributions. As part of its contemplated deal with the Debtor, KKV

---

[72] *See* Section I(C)(1) and accompanying footnotes, *supra.*

[73] *See* Ex. 38, October 27, 2009 Email.

[74] Ex. 56, Kashian Deposition at 277:15-278:4.

[75] *See* Ex. 46, Kabat Report, Appendix I.

20

intended to assume the Debtor's Lease as well as purchase the Debtor's LP Interest.[76] During the meeting held on September 17, Powell offered to return the Lease to Park 41, which Kashian refused.[77] The purported purpose for the capital call and cessation of distributions was to provide funds for tenant improvements for Debtor's former space.[78] However, under the terms of the Lease, the Debtor is responsible for its own tenant improvements.[79] Accordingly, if KKV had assumed the Lease, KKV, not Park 41, would have been responsible for covering tenant improvement costs. Thus, there would have been no need for a capital call or cessation of distributions.

Defendants baselessly assert that this is a mere disagreement between Defendants and the Debtor over the amount of the potential capital call that cannot violate the stay. This assertion both misses the point and mischaracterizes the facts of this case. The Debtor's claims for interference arise from Defendants' intentional misrepresentations to third party potential buyers, not to the Debtor. Before the filing of the Debtor's complaint, the parties had never even discussed Defendants' intent to make a capital call.[80] The Debtor learned about the threatened capital call through KKV's written explanation of why it was withdrawing its offer to purchase the Debtor's assets and through a report of Debtor's broker, Fena.[81] By then, though, the damage was already done.

Defendants also assert that Kashian was merely expressing his opinion and that his opinion cannot constitute a violation of the automatic stay. (Opening Brief at 26.) A similar defense was made by the defendants in *El Comandante* and rejected by the

---

[76] *See* Ex. 27, September 11 KKV LOI.

[77] *See* Ex. 57, Powell Deposition at 123:9-14.

[78] *See* Ex. 56, Kashian Deposition at 233:1-234:1.

[79] Ex.2 Lease at § 5.07.

[80] Ambro Affidavit ¶ 17.

[81] *Id.*

21

bankruptcy court. 358 B.R. 1. In that case, the trustee filed a motion to hold government officials in civil contempt for violations of the automatic stay, alleging that the officials exercised control over the property of the estate by publicly stating that the Puerto Rican government was *considering* seizing the estate's race track pursuant to its eminent domain powers. The defendants moved to dismiss the action arguing that their statements were not acts to obtain possession of or exercise control over property of the estate under Section 362(a)(3). *Id.* 15. The Court disagreed:

> Acts or *statements* directed to the government's *taking of debtors' property* by an eminent domain action, *may*, under certain circumstances, constitute *a violation of the automatic stay*, as the *consequences may be detrimental to debtors' reorganization and to the value of the estates*.

*Id.* at 15 (emphasis added). The Court found that

> [the governmental official] either *knew or should have known* that his acts and *statements would adversely affect debtors' reorganization*, and would have a *negative impact on the value of debtors' estates*.

*Id.* at 17 (emphasis added); *see also id.* at 23 (making similar findings in the context of defendants' motion for reconsideration). Kashian is a significant player in the Fresno commercial real estate market.[82] He knew or should have known that threats of an unreasonably large capital call would drive away potential buyers and substantially reduce the value of the Debtor's assets.[83]

---

[82] *See* Ex. 50, Darin Deposition at 33:24-34:16.

[83] Defendants' remaining argument bears no logical relation to whether their misrepresentations violate the automatic stay. Citing *In re Bobbitt*, 174 B.R. 548, 556 n.5 (Bankr. N.D. Cal. 1993), Defendants assert that harassment or coercion of the debtor alone cannot violate the automatic stay unless "accompanied by an act to collect, assess, or recover a prepetition claim." (Opening Brief at 26.) The referenced discussions in *Bobbitt* and *Morgan Guaranty Trust Co. of New York v. American Savings and Loan Assoc.*, 804 F.2d 1487 (9th Cir. 1986), both concern Section 362(a)(6) of the Bankruptcy Code, which prohibits acts "to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title." The automatic stay expressly protects debtors from seven other types of creditor actions, including actions "to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). Simply put, the plain language of Section 362(a)(3), which the Debtor relies on in support of its interference claims, *does not* require that efforts to obtain possession of or exercise control over property of the estate be accompanied by acts to collect on pre-petition debts.

22

3. *Defendants Have Used the Penalty Clause and Right of First Refusal to Interfere with the Debtor's Ability to Assign Its Assets.*

Defendants assert that their representations regarding the Right of First Refusal and Penalty Clause do not violate the automatic stay because those provisions are enforceable. (Opening Brief at 24-25). As a preliminary matter, the Penalty Clause is clearly not enforceable under California law against the Debtor or its future assignee. (*See* Section V, *infra*.) Any attempt to exercise this dilution provision would also violate the automatic stay. *See, e.g., Hinchliffe v. Stubeusz*, 1995 WL 412408 *1 (Civ. A. No. 95-1991 E.D. Pa. July 6, 1995) ("The debtor's partnership interest is, of course, governed by the automatic stay.").

Moreover, Defendants' argument also misses the point. Otherwise lawful acts that obstruct the sale of a debtor's assets are exercises of control over property of the estate violating Section 362(a)(3). *See, e.g., In re Brooks-Hamilton*, 348 B.R. at 525 (granting summary judgment for the trustee who claimed that the defendant's recording a *lis pendens* violated the automatic stay because "it *creates a cloud on title and interferes with a bankruptcy trustee's attempt to sell the real property, perhaps, even reducing the sale price. . . [t]his qualifies as the exercise of control over the real property*") (emphasis added); *In re Cady*, 266 B.R. 172, 183 (Bankr. 9th Cir. 2001) (recording an abstract of judgment was violation of the automatic stay when it evidenced an intent to delay or interfere with a trustee's efforts to sell property).

Kashian has used both the Penalty Clause and the Right of First Refusal to spread rumors intended to drive away potential buyers for the Debtor's interest. Kashian has asserted that he "was going to end up with the property."[84] Additionally, either Kashian or Defendants' agents have represented that the LP Interest is practically worthless because it had been reduced pursuant to the Penalty Clause.[85] Even if the Penalty Clause

---

[84] Ex. 52, Fena Deposition Vol. I at 64:9-65:10; *see also* 105:14-107:15.

[85] Ex. 54, Jerbich Deposition at 13:25-15:4; Ambro Affidavit ¶ 11.

and Right of First Refusal were enforceable—which, as discussed in Sections V and VII below, they are not—Defendants' use of these provisions to drive away potential bidders is actionable under the automatic stay.

> **B.** **There Are Material Facts at Issue Indicating That Defendants' Demand Letters and Purported Notices of Default Were Designed to Coerce and Harass the Debtor.**

Defendants incorrectly assert that their demands and purported notices of default do not violate the stay because the demands were not coercive and some of the demands arose from post-petition acts. (*See* Opening Brief at 6-22.) First, Defendants' argument that the demands and purported notices of default were merely non-coercive requests for payment ignores the fact that each "request" was backed by the implied or express threat that failure to comply would automatically reduce the Debtor's LP Interest to 1%.[86] The sheer number of demands, nearly a dozen in as many months, strongly indicates that Defendants intended to harass the Debtor, seizing on the slightest alleged slip to build a record that could ultimately be used to trigger the Penalty Clause.[87] At the very least, Defendants used their demands and purported defaults to pressure the Debtor into abandoning its property.

Second, the pre-petition/post-petition distinction should not affect the Court's analysis of whether the automatic stay has been violated. Section 362(a)(3) encompasses and prohibits every effort to exercise control over estate property regardless of whether such actions arise pre or post-petition. *See e.g., In re BNT Terminals*, 125 B.R. 963, 971 (Bankr. N.D. Ill. 1991) ("The court will not tolerate unauthorized acts by debtors or creditors by allowing possession of, or facilitating the exercise of control over, or permitting the dismemberment of property of the estate outside the provisions of the Code. To do so would make a nullity of section 362. . . ."). Simply put, the purpose of

---

[86] *See* Ex. 1, LP Agreement § 3.04.

[87] *See* Section I(E), *supra*.

the automatic stay is "not confined to pre-petition debts." *Matter of Garofalo's Finer Foods*, 186 B.R. 414, 436 (Bankr. N. D. Ill. 1995). Rather, "it protects and preserves the value of a chapter 11 estate against post-petition creditors who, without court approval, seek to take the property of the estate in satisfaction of their post-petition claims." *Id.*; *see also Acands, Inc. v. Travelers Casualty & Surety Co. (In re Acands, Inc.)*, 435 F.3d 252 (3d Cir. 2006).

The following acts constitute violations of the stay:

1.  *The Utility Demands Violate the Automatic Stay.*

Defendants made three separate demands for payment of approximately $25,000 in pre-petition utility charges, each of which threatened to reduce the Debtor's interest pursuant to the Penalty Clause, thereby violating Sections 362(a)(3) and (a)(6) of the Bankruptcy Code.[88] Defendants are aware of the coercive power of the Penalty Clause. For example, in the March 16 E-mail, Defendants' counsel noted that "[d]ue to this provision Gottschalks has been very careful to keep its lease obligations current on the office building."[89] But for the threat of a squeeze down under the Penalty Clause the Debtor would not have bowed to Defendants' pressure to pay this pre-petition claim.[90]

Defendants spend nine of the eighty pages of their Opening Brief arguing that the Utility Demands could not be coercive. (*See* Opening Brief at 7-17 (describing the tone of the messages as "objective" and "matter-of-fact," "neither threatening nor harassing").) The Utility Demands speak for themselves as to their coercive nature. Indeed, Defendants concede that Kashian's counsel's, Mr. Wilhelm's, "choice of language may be questioned." (Opening Brief at 16.) The Court may infer from the record that Defendants intended to pressure the Debtor into complying with their

---

[88] Ex. 7, March 16 E-mail; Ex. 8, March 17 E-Mail; Ex. 11, March 23 E-Mail.

[89] Ex.7, March 16 E-mail.

[90] Ambro Affidavit ¶ 13.

payment demands. Summary judgment is therefore precluded.

2. *The Roof Demands Violate the Automatic Stay.*

On three separate occasions, Defendants sent the Debtor letters demanding

payment of $31,000, which purportedly was for the Debtor's *pro rata* share of repairs to

the roof membrane for the River Park office building.[91] Defendants try their utmost to

construe the costs of the roof recoating as costs that arose post-petition. (*See* Opening

Brief at 20.) However, Defendants knew of the need to recoat the roof before the Petition

Date. The roof had not been recoated, as it is periodically required to be, since Park

View Plaza had been constructed.[92] Kashian states that Park View Plaza's Roof was

inspected due to leaks in the building.[93] However, Park View Plaza's tenants had been

complaining about leaks for years.[94]

Defendants held a pre-petition claim against the Debtor upon discovery of roofing

problems. *See* 11 U.S.C. § 101(5) (defining "claim" to include a "right to payment,

whether or not such right is reduced to judgment, liquidated, unliquidated, fixed,

contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or

unsecured").[95] Notably, Defendants were authorized to make demands on the Debtor at

---

[91] *See* Ex. 25, August 27 Letter; Ex. 33, October 5 Letter; Ex. 36, October 14 Letter. In actuality, the total amount was over $50,000, as Defendants unilaterally used $20,000 of the Debtor's excess CAM payments to cover towards payment of the Roof Demands.

[92] *See* The Affidavit of Edward M. Kashian in Support of Defendants Motion for Summary Judgment (the "Kashian Affidavit") ¶ 5.

[93] *Id.*

[94] *See* Ex. 28, September 12, 2009 E-mail from Ouassou to Anaforian.

[95] While Defendants may attempt to argue that their "right to payment" for roofing repairs only arose once demand was made on Debtor, which first occurred in August 2009, Defendants held a contingent claim against the Debtor for the roofing repairs as of the date when Defendants were on notice that there was damage to the roof. *In re Dill*, 731 F.2d 629, 631 (9th Cir. 1984) ("[C]laims are contingent . . . if the debt is one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger the liability of the debtor to the alleged creditor and if such triggering event or occurrence was one reasonably contemplated by the debtor and creditor at the time the event giving rise to the claim occurred.").

any time to pay a capitalized, *pro rata* share of the roof costs after discovery of the roof damage. Their failure to do so until after the Petition Date does not convert their claims into post-petition claims. The three separate roofing demands were made to enforce a pre-petition, contingent claim, and were in violation of Section 362(a)(3) and (6) of the Bankruptcy Code.

Moreover, Defendants sat on their rights to demand payment for recoating the roof for months during the bankruptcy, while the Debtor assumed the Lease and the Court set cure amounts for assumption.[96] The Debtor filed its motion to assume the Lease on February 12, 2009. On March 4, 2009, Defendants received notice that Park View Plaza's roof needed to be recoated.[97] A month later, on April 7, 2009, they received a proposal to perform the recoating.[98] Kashian did not authorize these capital improvements until August 21, 2009, after the Debtor assumed the lease.[99] A non-debtor party to a contract or unexpired lease bears the burden of asserting any defaults that require cure for assumption of the contract or lease; it cannot "*lay in the weeds*" and wait until after assumption to raise purported rights to payment that should have been raised at the time the court sets a cure amount. *In re Ali Properties, Inc.*, 334 B.R. 455, 461 (Bankr. D. Kan. 2005) (emphasis added); *see also In re Cellnet Data Sys., Inc.*, 313 B.R. 604, 608 (Bankr. D. Del. 2004) (the order setting cure expressly enjoined claimants from asserting thereafter any claims arising from pre-assignment defaults). Paragraph 5 of the Order Authorizing Assumption [Docket No. 624] (the "Assumption Order") provided as follows:

---

[96] Defendants' own evidence indicates that they were notified of damage to the roof at least as of March 2009, when the roof was inspected. *See* Kashian Affidavit ¶ 5. The Order approving assumption was not entered until August 3, 2009.

[97] Ex. 6, March 4, 2009 Letter from Warner Hobart to Blair Cunnings.

[98] Ex. 13, April 7, 2009 Roofing Proposal.

[99] Ex. 15, August 21, 2009 Email from Dix to Malaky. Indeed, Defendants' own communications show that the Roof Demands were timed with the express intent of sticking the Debtor with the costs of recoating the roof before it vacated Park View Plaza. *See* Ex. 29, September 13, 2009 E-mail from Anaforian to Dix.

All defaults, claims or other obligations of the Debtor arising or accruing under the Office Lease and each Contract, if any, prior to the Closing Date . . . shall be deemed cured and satisfied by the Debtor or the Assignee . . . by the payment of the applicable cure amounts in accordance with Section 2.1 of the Purchase Agreement.

Section 2.1 does not refer to charges for recoating Park View Plaza's roof.[100] By the express language of the Order, the Debtor was discharged of all claims and obligations arising prior to the Closing Date. Thus, even assuming *arguendo* that the Roofing Demands do not constitute acts to enforce pre-petition claims against the Debtor, they were unenforceable because the Court had already ordered a discharge.

      3.    *The Totality of the Demands Constitutes Coercive and Harassing Behavior that Violates the Automatic Stay.*

Defendants are keenly aware of the Debtor's weakened financial condition and the strain that maintaining the Lease and the associated carrying cost has placed on the Debtor's estate. Shortly after the Debtor assumed the Lease, Defendants' counsel made the following observations:

- "Gottschalks has assumed the lease so they are still looking to unload the partnership interest and lease at this time. They may be a little more desperate than the last go round on this."[101]

- "At this point there is no pending offer that I am aware of. Eventually I have to believe that the creditors will push DJM Realty [the Debtor's broker at the time] to fish or cut bait on this deal. They are paying money every month for a big empty space at this point."[102]

- "[E]ventually they [the Debtor] need to do something otherwise they are simply throwing money down a rat hole."[103]

---

[100] Section 2.1 of the Purchase Agreement [filed at Docket No. 737] refers solely to Schedule 2.1 of the Purchase Agreement, which sets cure at approximately $25,199.57 for the Utility Demands.

[101] Ex. 24, August 21, 2009 E-mail from Wilhelm to Powell.

[102] Ex. 26, September 2, 2009 E-mail from Wilhelm to Powell.

[103] *Id.*

Defendants' purportedly innocent demands must be viewed through the prism of their belief that the Lease placed considerable financial pressure on the Debtor to sell the LP Interest and assign the Lease.

In addition to the Utility and Roof Demands, Defendants have issued five other demands or purported notices of default to the Debtor in 2009.[104] The petty nature of some of these alleged infractions demonstrates Defendants' eagerness to seize on any opportunity to harass the Debtor and ratchet down its partnership interest through the Penalty Clause.

On April 14, 2009, Defendants demanded "as-built" drawings even though they already had them.[105] Defendants appeared to be dissatisfied that their copy was not in electronic form.[106] Approximately a month later, on May 18, 2009, Defendants threatened to place the Debtor in default for selling office fixtures from the leased premises,[107] failing to mention that the Court had already authorized this sale.[108] On July 29, 2009, Defendants threatened to place the Debtor in default for selling merchandise from the leased premises, ignoring the fact that Park View Plaza's other tenants comprised the majority of the participants in the sale and that the Debtor provided additional security at its own expense.[109] Similarly, on October 8, 2009, Defendants issued a notice of default because the Debtor had inadvertently allowed its umbrella policy, which provides excess insurance to lapse.[110] While a technical violation of the

---

[104] Defendants also demanded "as-built" drawings, and that the Debtor increase its general liability insurance on the building. Whether or not these demands, standing alone, violate the automatic stay, the acts were part of a pattern of harassing and coercive conduct in violation of Section 362(a)(3).

[105] Ex.14 April 14 E-mail.

[106] Ex. 19, June 2, 2009 E-Mail from Warren to Wilhelm.

[107] Ex. 17, May 18 E-mail.

[108] Ex. 18, May 20 E-mail from Redwine to Wilhelm.

[109] Ex.21, July 29 E-mail; Ambro Affidavit ¶ 16.

[110] Ex. 34, October 8 E-mail.

lease, the lack of the umbrella policy was of little import as the Debtor only had 10 remaining employees at the time and the additional insurance in the amount of $10 million was unnecessary given the Debtor's other liability policies and the rejection or assignment of now-closed retail locations.[111] In any event, once notified, the Debtor took immediate action to rebind the policy, despite the fact that it made no economic sense to carry that level of coverage for a largely liquidated business.[112] Lastly, beginning in the Summer of 2009, Defendants began an extensive renovation to Park View Plaza's landscaping purportedly to bring it in line with the requirements of a "Class A" office building.[113] This was a pretense, however, as every witness questioned on the matter except Kashian has testified that the new landscaping was unnecessary.[114] On December 22, 2009, Defendants issued a demand to the Debtor for over $62,000 for the landscaping, which was later withdrawn.[115]

When demands alone proved to be insufficient to push the Debtor out, Defendants took the next step and cut off the flow of distributions.[116] While Defendants have their story as to why the distributions were discontinued (Opening Brief at 32), the timing and necessity of their decision is inherently suspect. Earlier in 2009, Defendants considered discontinuing distributions; they did not because they were advised that doing so would violate the stay.[117] Inexplicably and with no prior notice to the Debtor or relief from the stay, this thinking changed in November.

Cumulatively, these actions constitute a violation of the automatic stay. *See e.g.,*

---

[111] Ambro Affidavit ¶ 16.

[112] *Id.*

[113] Kashian Affidavit ¶ 6.

[114] *See, e.g.,* Schuh Deposition at 79:18-21; Fena Deposition Vol. 1 at 101:9-102:4; Baldwin Deposition at 106:1-107:7.

[115] Ex. 43, December 22 E-mail, *supra*; Ex. 56, Kashian's Deposition at 263:3-17;

[116] Ex. 41, November 5 Letter.

[117] *See* Ex. 51, Dix Deposition at 30:17-31:8.

RLF1 3560650v.1

*In re Newport Offshore, Ltd.*, 88 B.R. 566, 568 (Bankr. D. R.I. 1988) (acts designed to effectuate a setoff of the debtor's claims "cumulatively amount to violations of the automatic stay"); *In re Kortz*, 283 B.R. 706, 714-15 (Bankr. N.D. Ohio 2002) (describing multiple communications by a creditor in attempts to collect on the creditor's debts as harassing, and awarding punitive damages to the debtor and equitably subordinating creditor's claim as a result of the harassing communications).

Even if Defendants provided facially legitimate excuses justifying the foregoing behavior, the Court must still assess whether Defendants' actions were taken for the purposes of controlling the Debtor's property and interfering with their sale. Bankruptcy courts have held that the use of otherwise lawful and enforceable instruments to obstruct the sale of a debtor's assets qualifies as an exercise of control over a debtor's property and violates the automatic stay. *See, e.g.*, *In re Cady*, 266 B.R. at 183 ("Where . . . there is evidence that a creditor recorded an abstract of judgment with the intent to delay or otherwise interfere with a trustee's efforts to sell estate property, or a creditor uses a recorded abstract to interfere with the administration of estate assets, such conduct will rise to the level of an automatic stay violation."). Accordingly, summary judgment is not appropriate.

## V. THE DEBTOR'S CLAIM FOR DECLARATORY RELIEF AS TO THE PENALTY CLAUSE IS RIPE FOR ADJUDICATION.

The Debtor's Third Claim for Relief seeks declaratory judgment regarding the Penalty Clause in Section 3.04 of the LP Agreement, which clause Defendants refer to as the Dilution Provision. (*See* Opening Brief at 33.) Regardless of its name, this clause reduces the Debtor's LP Interest from 36% to 1% in the event of *any* default on the Lease. The Debtor requests that the Court find that the Penalty Clause is unenforceable as to the Debtor and any future assignee of the LP Agreement, because "it bears no reasonable relationship to the range of actual damages that the parties could

have anticipated would flow from a breach," as is required by California Law. *See, e.g.,* *Ridgley v. Topa Thrift & Loan Association*, 17 Cal. 4th 970, 977-78 (1998). At trial, the Debtor will offer evidence, including expert testimony, that the Penalty Clause does not meet this standard.[118]

Defendants' Opening Brief fails to address this test.[119] (See Opening Brief at 33-37.) Rather, Defendants make the untenable argument that no actual controversy requiring declaratory relief exists because the Penalty Clause does not in any way affect the value of the Debtor's LP Interest and the Lease.

Declaratory relief is appropriate when "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality." *Mull Drilling Co. v. SemCrude, L.P. (In re SemCrude)*, 407 B.R. 82, 94 (Bankr. D. Del. 2009). "It is well-settled that declaratory relief is available 'to settle actual controversies before they ripen into violations of a law or a breach of duty.'" *Id.* (quoting *United States v. Fisher-Otis Co.*, 496 F.2d 1146, 1151 (10th Cir. 1974)). Here, an actual case and controversy exists because (1) Defendants have asserted that any assignment of the LP interest must be subject to the Penalty Clause; (2) the Penalty Clause substantially impedes the Debtor's ability to assign its assets; (3) Defendants have used and, absent judicial intervention, are likely to continue to use the Penalty Clause as a means to force the Debtor to abandon its property; and, as shown further below, (4) the Debtor and Defendants disagree over whether the Penalty Clause is enforceable. These material

---

[118] *See* Ex. 45, VanderLey Report at 9-10.

[119] Notably Defendants' *ex post facto* rationalization that the Penalty Clause was necessitated by the recession in the early 1990's (Opening Brief at 33 n. 9) was never raised by Kashian during his deposition, notwithstanding ample opportunity to do so. *See* Ex. 56, Kashian Deposition at 40:20-42:3 (discussing the bases for the Penalty Clause); *see also* Ex. 44, Defendants' Interrogatory Responses, Interrogatory No. 3 (attributing the Penalty Clause to the Debtor's below market rent). Indeed, any claims that the Penalty Clause is somehow unique to the Debtor or the circumstances under which Park 41 was formed are belied by Kashian's admission: "Every partner I've had along those lines [also holding a lease in the building], and there's only been three, that have agreed to that thing, because they don't believe that they're ever going to default on a lease, and I do not want them to default on a lease." *Id.* at 125:8-12.

issues of fact preclude summary judgment.

A.    **Defendants Have Placed the Validity of the Penalty Clause at Issue.**

On February 12, 2009, the Debtor filed its *Motion to Approve Orders (I) Approving Sales Procedures with Respect to the Sale of Substantially All of the Debtor's Assets as a Going Concern and/or via Store Closing Sales and (II) (A) Authorizing the Sale of Substantially All of the Debtor's Assets Free and Clear of all Liens, Claims and Encumbrances Pursuant to Section 363 of the Bankruptcy Code, (B) Authorizing the Assumption and Assignment of Leases and Contracts Pursuant to Section 365 of the Bankruptcy Code and (C) Approving Sales Guidelines, to the Extent Necessary, for Conducting Closing Store Sales* [Docket No. 165] (the "Sales Motion"). The Sales Motion contemplated the possible assumption and assignment of both the LP Interest and Lease as part of the Debtor's efforts to sell its assets and maximize the value of its estate.  On March 10, 2009, Defendant RPP III and related entities filed a *Limited Objection to Motion of Debtor and Debtor in Possession for Entry of Orders Allowing for the Assumption and Assignment of Nonresidential Real Property Leases and Executory Contracts under 11 U.S.C. § 365* [Docket No. 240] (the "Limited Objection").  The Limited Objection asserted that the Penalty Clause was valid and objected to assignment of the Debtor's LP Interest, unless it was made subject to the Penalty Clause.[120]  Although the Sales Motion was decided and the Limited Objection is now moot,[121] in out-of-court statements to the Debtor and others, Defendants have repeated their position that the

---

[120] Limited Objection [Docket No. 204] at ¶ 18(A)(iii); *see also id.* ¶13.

[121] As discussed below in Section VIII, the Limited Objection does not constitute an ongoing litigation between the parties for the purposes of Defendants' putative litigation privilege they raise pursuant to California law.  Of course, it is not necessary for there to be existing litigation concerning a contractual provision to seek declaratory relief.  Indeed, the entire concept of declaratory relief proceeds from the premise that there is not pending litigation by the potential aggressor, here Defendants.  *See e.g., In re SemCrude*, 407 B.R. at 94.

33

Penalty Clause is enforceable and that any assignment must be made subject its terms.[122]

Defendants have also demanded that all potential buyers be advised of the provision.[123]

Defendants concede on page 25 of their Opening Brief that "the enforceability of [the Penalty Clause] is in dispute." Accordingly, an actual case and controversy as to the validity of the Penalty Clause against the Debtor and its Assignees clearly exists.

B. **The Ability to Hold the Penalty Clause Unenforceable Is Critical to the Debtor's Efforts to Sell Its Assets.**

As discussed above in Sections I(D)(1) and IV(A)(3), the Penalty Clause has been a source of concern and consternation for many potential buyers and has been used by Defendants to lower the value of and interest in the Debtor's assets. At trial, the Debtor will present expert testimony and other evidence that the Penalty Clause both stymies the Debtor's assignment efforts and materially lowers the value of the LP Interest (because anyone who acquires the LP Interest will have to assume the liability for the rent and CAM charges for the remaining approximately 18-month term of the Lease to avoid a default and resulting ratchet down of the LP interest).[124]

Defendants assert that the Penalty Clause does not impact the value of the Debtor's property interests because, regardless of the enforceability of the Penalty Clause, the Debtor would still be responsible for the remaining lease payments, and the total value of the LP Interest to the Debtor's estate would be reduced by the amount of such payments. (Opening Brief at 35-37.) First, Defendants' argument concedes the accuracy of the Debtor's expert's analysis, which shows that the Penalty Clause lowers the amount that a potential buyer would be willing to pay for the LP Interest.[125] This is

---

[122] *See e.g.*, Ex. 3, January 23, 2009 E-Mail from Wilhelm to Kaufman; Ex. 15, April 21, 2009 E-Mail from Wilhelm to Rinehart.

[123] *Id.*

[124] *See* Ex. 45, VanderLey Report at 7.

[125] *See* Ex. 45, VanderLey Report at 7.

because the potential buyer would deduct the amount of remaining rent and CAM charges (approximately $92,000 monthly) from the LP Interest purchase price to create a "self insurance" fund to ensure there was no default on the Lease for its remaining term, which expires in October 2011.[126] The need to create such a fund is necessitated by the Penalty Clause. Accordingly, invalidating the Penalty Clause would significantly increase the value of the LP Interest to the estate.

Second, Defendants ignore the material limitations the Penalty Clause places on the Debtor's ability to market the LP Interest and Lease. Under the current circumstances, the Debtor can only market the LP Interest and Lease to buyers interested in acquiring both assets.[127] A rational buyer of the LP Interest is unlikely to accept it without the Lease because to do so would place control of the Lease and, accordingly, the fate of the LP Interest in the hands of a third party.[128] In the absence of the Penalty Clause, the Debtor would have the option of marketing these assets separately, thus increasing the potential value of both.

Third, Defendants argument is predicated on the manifestly false assumption that the Penalty Clause is limited to the failure to pay the rent. In fact, it purports to apply to "*any* default" under the Lease irrespective of how minor it may be.[129] Since the Petition Date, Defendants have sent a series of demands and putative defaults regarding any issue they can devise no matter how immaterial—from claims related to "as built drawings" to prepetition utility claims that were barred by the automatic stay. (*See* Section I(E), *supra.*) Pursuant to the Penalty Clause, any of these minor or technical errors could result in loss of the LP Interest, not just the failure to pay rent.

Finally, Defendants' argument presupposes that any allowed claims for unpaid

---

[126] *Id.*

[127] *Id.*

[128] *Id.*

[129] Ex. 1, LP Agreement § 3.04.

rent would be deducted dollar for dollar from the value of the LP Interest in the form of an offset, leaving the balance of the LP Interest in the Debtor's hands. That is simply not how the Penalty Clause purports to work. Even if the Penalty Clause was limited to defaults for the payment of rent—and Defendants have made quite clear that it is not— then failure to pay the rent would leave the Debtor with no continuing LP Interest, *but still liable for the full amount of the rent.*[130] That is, imposition of the Penalty Clause and loss of the LP Interest would impose a loss of $4.6 million on the estate, while Defendants could still assert the right to collect all the rent due from the estate. Similarly, the Penalty Clause would strip the estate of the $4.6 million LP Interest even if Defendants procured a replacement tenant immediately and even if the rent received from that new tenant exceeded the rent paid by the estate under the Lease with no loss to Defendants. Far from disproving the Debtor's case that the Penalty Clause would impose loss on the estate; Defendants' strained arguments have only served to prove how unreasonable the Penalty Clause is.

C.     **The Debtor's Declaratory Relief Is Necessary Because Defendants Have Been Using the Penalty Clause to Threaten and Harass.**

In response to the Debtor's request for a declaration that a default under the Lease would not trigger the Penalty Clause, Defendants argue incorrectly that this declaration is "entirely abstract and hypothetical." (Opening Brief at 37.) As discussed above in Section I(E), Defendants have used the Penalty Clause to harass the Debtor with unenforceable and/or unwarranted demands and to threaten the Debtor with a squeeze-down of its LP Interest if those demands are not met. Notably, this pattern of harassment seems to have abated after the Debtor brought the instant lawsuit, at least temporarily.

There is also no merit in Defendants' contention that Park 41 is a necessary party to the declaratory relief claim. Park 41 is not a necessary party because RPP III, not Park

---

[130] *Id.*

41, is the party empowered to exercise the Penalty Clause's squeeze-down provision and is the beneficiary of the squeeze-down.

## VI.    THE DEBTOR'S CLAIM FOR DECLARATORY RELIEF REGARDING THE CAPITAL CALL IS RIPE FOR ADJUDICATION.

The Debtor's Fifth Claim for Relief seeks a declaration regarding the capital call threatened by Defendants. The Debtor brought this claim to preserve its ability to sell the LP Interest, after receiving reports from one of its potential buyers, Hanno Powell, and its broker, Robert Fena, that Kashian had represented that a capital call in the sum of $5 million to $8 million was imminent.[131] The Debtor seeks a declaration stating that no capital call is presently necessary, there is no reasonable basis for the size of the capital call threatened by Kashian, and RPP III must seek relief from the stay before imposing any capital call on the Debtor while it is in Bankruptcy.

Defendants attempt to dismiss this claim as unripe by portraying it as "hypothetical." (*See* Opening Brief at 43-44.) The Debtor's request for declaratory relief is ripe because: (1) Kashian is in discussions to issue a capital call within the next three months; and (2) the issuance of a capital call would violate the automatic stay and, if in the magnitude threatened by Kashian, could potentially compel the Debtor to abandon the LP Interest.[132] Even if it were a close issue as to whether a controversy exists, the court should err on the side of finding jurisdiction given the legislative intent that the Declaratory Judgment Act be interpreted liberally. *See, e.g., Aralac v. Hat Corp. of America*, 166 F.2d 286, 291 (3d Cir. 1948) ("This court has emphasized that the Act should have a liberal interpretation bearing in mind its remedial character and the

---

[131] *See* Ex. 34, October 8 KKV Withdrawal E-mail; Ex. 38, October 27 E-mail.

[132] Additionally, there is evidence that the RPP III, through its agents, made representations regarding the capital call that have adversely impacted the Debtor's efforts to market the LP Interest. (*See* Sections I(D)(3) and IV(A)(2), supra.)

legislative purpose."); *Algrant v. Evergreen Valley Nurseries Ltd. Partnership*, 126 F.3d 178, 189 (3d Cir. 1997) ("Bearing in mind the remedial character and legislative purpose of the Declaratory Judgment Act, we have repeatedly emphasized that the Act should have a liberal interpretation."); *Exxon Corp. v. Federal Trade Comm'n*, 588 F.2d 895, 900 (3d Cir. 1978) (reversing the district court's denial of declaratory relief).

Although the Debtor recently learned that Kashian is talking about issuing a capital call within the next three months,[133] there is no basis for a capital call at this time. Defendants' own expert doesn't project the need for a capital call until February of 2012.[134] He had no explanation when asked in his deposition what justifiable reason Kashian could have for making a capital call now. However, any such capital call, particularly if it were in the magnitude previously stated by Defendants, would probably cause the Debtor to have to relinquish the LP Interest.[135]

Declaratory relief is also necessary to clarify that a capital call issued while the Debtor is still in bankruptcy would violate the automatic stay. Partners of bankruptcy debtors regularly seek relief from the automatic stay before issuing capital calls. *See, e.g., In re Beale*, 410 B.R. 613, 619 (N.D. Ill. 2009) (noting that non-debtor moved to "lift the bankruptcy stay to make a capital call"). This is because a capital call represents a demand on estate assets. *See* 11 U.S.C. § 362(a)(3) -(4) (prohibiting acts to obtain possession of, or exercise control over, the property of the estate and create, perfect, or enforce a lien against the property of the estate). It would also be a violation of the automatic stay for Defendants to reduce the Debtor's LP Interest or withhold the Debtor's distributions in the event the Debtor does not satisfy a capital call. *See In re McCabe*, 345 B.R. 1, 6 (D. Mass 2006) (holding that unilateral adjustment of partnership interest to

---

[133] Ex. 47, Kabat Hand Written Notes; *see also* Ex. 55, Kabat Deposition at 264:1-15.

[134] Ex. 46, Kabat Report, Appendix I.

[135] Ambro Affidavit ¶ 18.

reflect capital contributions violated the automatic stay). Thus, declaratory relief is warranted regarding the threatened capital call, and the test for summary judgment with respect to that claim cannot be satisfied.

VII. **THE DEBTOR'S CLAIM FOR DECLARATORY RELIEF AS TO THE RIGHT OF FIRST REFUSAL IS NOT BARRED AS A MATTER OF LAW.**

The Debtor's Fourth Claim for Relief seeks declaratory judgment regarding the Right of First Refusal, which gives Defendant RPP III the right to match any bid made by a potential assignee for the LP Interest. The Debtor requests that the Court declare that pursuant to Bankruptcy Code Section 365(f) the Right of First Refusal is a *de facto* anti-assignment provision and unenforceable as to the Debtor.

Defendants assert that the Right of First Refusal is enforceable as a matter of law and that courts have been uniform in their treatment of provisions of this kind. In fact, according to *In re IT Group, Inc., Co.*, on which Defendants primarily rely, "the Bankruptcy Court does retain some discretion in determining whether provisions that do not explicitly prohibit assignment qualify as de facto anti-assignment clauses rendering them unenforceable." 302 B.R. 483, 488 (D. Del. 2003). In the Third Circuit, the enforceability of a right of first refusal, and similar provisions, turns on the application of the phrase "material and economically significant." *See In re Joshua Slocum, Ltd.*, 922 F.2d 1081 (3d Cir. 1990);[136] *see also In re Fleming Cos., Inc.*, 499 F.3d

---

[136] Defendants incorrectly state in their Opening Brief that "[t]he United States District Court for the District of Delaware has rejected" one of the primary cases cited by Gottschalks, *In re Mr. Grocer, Inc.*, in support of its argument in the Motion to Enforce the Automatic Stay that the Right of First Refusal is Unenforceable. (*See* Opening Brief at 39). Notably, in devising the "material and economically significant" standard, the Third Circuit in *Joshua Slocum*, relied in part on *Mr. Grocer*, a case the Debtor's relies on and Defendants seek to distinguish. *See In re Joshua Slocum*, 922 F.2d at 1092. While Defendants seek to minimize the effects of the *Mr. Grocer* decision, it remains an important case for its discussion of the bid-chilling effects of a right of first refusal. In addition to its citation in the *IT Group* decision, Judge Gerber discusses the *Mr. Grocer* decision at length in *In re Adelphia Communications Corp.*, 359 B.R. 65, 86-87 (Bankr. S.D.N.Y. 2007), calling it the "*seminal case invalidating rights of first refusal under 365(f)(1)*" and noting that "[d]evelopments in the disposition of assets in bankruptcy cases since *Mr. Grocer* was decided have underscored Judge Yacos' prescience in terms of the chilling effects on bidding." Judge Gerber noted that since *Mr. Grocer* was decided, stalking horse bidding protections and formalizing bidding procedures in estate auctions have become commonplace in order to "protect the first

39

300, 305 (3d Cir. 2007). The "material and economically significant" standard set forth in *Joshua Slocum* requires this Court to balance two potentially competing interests: (1) "preventing substantial economic detriment to the nondebtor contracting party" and (2) "permitting the bankruptcy estate's realization of the intrinsic value of its assets." *In re Fleming* at 306. Accordingly, the enforceability of the Right of First Refusal is a fact-intensive inquiry, making summary judgment inappropriate.

    1.    *Invalidating the Right of First Refusal as to the Debtor Will Not Impose a Significant Economic Detriment on Defendants.*

Defendants have yet to show any "substantial economic detriment" that would result from the Court invalidating the Right of First Refusal. Nor can they meet this burden. Before any assignment of the LP Agreement can be made, the Debtor must provide adequate assurance of future performance by its proposed assignee under Section 365(f)(2)(B) of the Bankruptcy Code. The provisions of 365(f)(2)(B) are more than sufficient to protect RPP III's economic interests in the absence of the Right of First Refusal. Defendants' Motion fails to address Section 365(f)(2)(B)'s protections.[137]

A review of *IT Group* does not mandate a different result as its facts are clearly distinguishable. In that case, the holder of the right of first refusal was entitled to receive an allocation of the purchase price on completion of the sale. This reduced the risk holder trying to chill the bidding because both parties had an interest in maximizing the bidding. 302 B.R. at 488-89. Moreover, the court was properly leery of divesting the

---

bidder from the unfairness of being the first bidder in the fray and being outbid by those holding back--an unfairness that is compounded when one of the competing bidders can win without paying *anything* more." *Id.* at 87.

[137] Even without the benefit of Section 365(f)(2)(B), the LP Agreement itself ensures that RPP III will not suffer any substantial economic detriment. Section 4.04 of the LP Agreement provides that in the event that any partner does not make a required capital contribution, the other partner may make the required contribution, and the non-contributing partner's interest may be decreased more than proportionately according to a formula set out in the Agreement.

holder of its interest in the proceeds from the sale. *Id.* at 489. Here, Defendants are not entitled to any of the proceeds from the assignment of the Debtor's LP Interest and do not have a corresponding interest in maximizing the value of the LP Interest.[138] In fact, Defendants have an interest in depressing the value of the LP Interest so they can buy it for a bargain or get it for free.

2.     *The Right of First Refusal Has Severely Impeded the Debtor's Efforts to Market the LP Interest.*

There is substantial evidence that the Right of First Refusal has had a material chilling effect on the Debtor's efforts to find buyers for the LP Interest. The significant costs involved in negotiating and closing a possible commercial real estate investment generally cause potential bidders to grow hesitant in the presence of a right of first refusal.[139] Several potential bidders communicated to the Debtor's broker that the Right of First Refusal provision was a factor that caused them to lose interest in the transaction, while others have sought to have it waived.[140]

The detrimental impact of a right of first refusal has been well-documented by bankruptcy courts. As the Court in *In re Adelphia Comm'ns. Corp.* observed:

> Among the types of *provisions that have been held to be unenforceable* under section 365(f) *are rights of first refusal, and for good reason. They always "restrict" assignment*—one of the three types of scenarios that result in invalidation under section 365(f). And in many (though not all) circumstances, *rights of first refusal will do so in a fashion that materially impairs the estate's ability to maximize value for its creditors when it markets its assets*, which often consist of (partly or entirely) executory contracts.

---

[138] *See* Ex. 1, LP Agreement § 7.04.

[139] *See* Ex. 10, Declaration of Michael Jerbich at ¶¶ 3-7; Ex. 54, Jerbich Deposition at 57:5-13.

[140] *See* Ex. 52, Fena Deposition Vol. I at 30:8-16; Ex. 49, Baldwin Deposition at 24:16-25:10; Ex. 57, Powell Deposition at 127:7-13.

359 B.R. 65, 85-86 (Bankr. S.D.N.Y. 2007) (emphasis added).[141]  Again, consideration of

*IT Group* does not mandate a different result.  *IT Group* does not create a *per se* rule

validating all rights of first refusal.  302 B.R. at 488 (noting that the court has discretion

to determine the enforceability of the right of first refusal based on the facts of the case

at hand).  It merely holds that under the circumstances of that particular case, the

provision was enforceable.  *Id.* at 488.  That holding was based on the Court's finding

that "enforcing the right of first refusal *in this case* would [not] hamper the Debtor's

ability to assign the property or foreclose the estate from realizing the full value of the

Debtor's interest . . . ."  *Id.* (emphasis added).  Thus, contrary to Defendants' contention,

*IT Group* does not foreclose consideration of whether a right of first refusal improperly

"prohibits, restricts, or conditions the assignment" of a contract in violation of Section

365(f).  *Id.*

 The other cases cited by Defendants that consider Section 365(f) are

distinguishable from the present case.[142]  In *In re Capital Acquisitions & Mgmt. Corp.*,

341 B.R. 632 (Bankr. N.D. Ill. 2006), following the *IT Group* decision, the court

determined that the right of first refusal at issue was enforceable because it would not

hamper the debtor's ability to assign the property because it merely "provide[d] a

mechanism for determining the fair market value [of the asset by]. . . the mandatory

---

[141] *See also In re Mr. Grocer, Inc.*, 77 B.R. 349, 355 (Bankr. D.N.H. 1987) ("[T]he chill may be well intensified if prospective bidders must be advised . . . that the assets in question could be taken away from them even after a court order approving the same has been entered -- not by virtue of any higher bid but simply at the same price under a first refusal right.").  Notably, *Mr. Grocer's* holding and analysis is <u>not</u> limited to *ipso facto* clauses triggered by a debtor's filing for bankruptcy protection.  *Id.* at 354.

[142] The remaining cases cited by Defendants do not address the bid-chilling effects of rights of first refusal pointed out in the *Mr. Grocer* decision, nor do they address § 365(f).  *See In re Gibson*, 1995 Bankr. LEXIS 1727 at *4-5 (Bankr. E.D. Va. Aug. 21, 1995) (no indication that the court considered whether enforcement of the right of first refusal would unfairly chill bidding on estate assets); *In re Six*, 190 B.R. 958, 961 (Bankr. M.D. Fla. 1995) (same); *In re Baquet*, 61 B.R. 495, 500 (Bankr. D. Mont. 1986) (same); *In re Todd*, 118 B.R. 432, 435 (Bankr. D.S.C. 1989) (same); *In re Cormier*, 382 B.R. 377, 386-87 (Bankr. W.D. Mich. 2008) (same); *Calvert v. Bongards Creameries (In re Schauer)*, 62 B.R. 526, 529-30 (Bankr. D. Minn. 1986) (same).  Accordingly, these cases do not offer the Court the proper guidance in determining the controversy at bar.

42

appraisal [process]. . . ." *Id.* at 638. In *In re E-Z Serve Convenience Stores, Inc.*, 289 B.R. 45 (Bankr. M.D.N.C. 2003), the court held the right of first refusal at issue was enforceable because the trustee submitted "no evidence that the existence of a right of first refusal had a chilling effect on the sale procedure." *Id.* at 51. Indeed, the facts showed that the landlord, who held the right of first refusal had submitted the highest and best bid for the property in question. *Id.* at 49, 54.

Defendants' pattern of wrongful conduct further distinguishes this case from those relied on by Defendants. The existence of the Right of First Refusal allows Kashian, after he has driven down the value of the Debtor's LP Interest through a campaign of misinformation, to control his ability to purchase the asset at the depressed price artificially created by his own unlawful conduct. It also buttresses Kashian's claim, which he has been circulating in Fresno, that he will wind up getting the building, a claim that he has used successfully to discourage potential buyers. Because Defendants have misused the Right of First Refusal, it would be inequitable to allow them to profit from their malfeasance by enforcing the Right of First Refusal. *See e.g.*, *In re Beck Indus., Inc.*, 605 F.2d 624 (2d Cir. 1979) (holder of right of first refusal's side agreement with a potential bidder aimed at deflating the purchase price of estate assets prevented holder's exercise of right of first refusal as an equitable remedy for interference in the auction).

VIII.  **THE DEBTOR'S PENDENT STATE-LAW CLAIMS ARISING FROM DEFENDANTS' INTEREREFENCE WITH THE ASSIGNMENT OF THE LP INTEREST ARE NOT BARRED BY CALIFORNIA'S LITIGATION PRIVILEGE.**

In addition to bringing claims for violation of the automatic stay, the Debtor has also brought state law claims for breach of the covenant of good faith and fair dealing (Eighth Claim for Relief), breach of fiduciary duty (Ninth Claim for Relief), and intentional and negligent interference with prospective economic advantage (Tenth and

Eleventh Claims for Relief), all which turn on Defendants' interference. Recognizing that the Debtor's evidence precludes the entry of summary judgment on the merits of Debtor's state law claims, Defendants seek to invoke California's litigation privilege to immunize their unlawful actions.

Defendants' argument fails, however, because (1) the far more narrow federal litigation privilege applies to Debtor's state law claims and (2) even if California's litigation privilege applied to those claims, the requirements of the privilege are not met here. Defendants do not address the federal litigation privilege. As to the California litigation privilege, Defendants cite no authority on point. It appears that no court has extended the California litigation privilege to protect out-of-court misrepresentations made to a potential buyer of a chapter 11 debtor's assets.

There is good reason no court has done so. If such statements were privileged, it would give carte blanche to interfere in the assignment of bankruptcy assets, thereby frustrating a fundamental purpose of chapter 11 bankruptcy, namely, maximizing the value of the estate's assets in order to increase the total recovery for all creditors. *Toibb v. Radloff*, 501 U.S. 157, 164 (1991) (stating that allowing a business or other person to file for Chapter 11 "serves the congressional purpose of deriving as much value as possible from the debtor's estate."); *In re Bonner Mall P'ship*, 2 F.3d 899, 915 (9th Cir. 1993) (noting that the two major objectives of chapter 11 are to permit the successful rehabilitation of debtors, and to maximize the value of the estate for the benefit of all creditors).

A. **The Federal Common-Law Litigation Privilege, Not the California Privilege, Applies to the Debtor's Pendent California Contract and Tort Claims.**

While the Debtor's contract and tort claims are governed by California substantive law, the determination of the privileges applicable to those claims—and specifically the litigation privilege—is governed by federal law. The Debtor asserts

federal claims for violation of the automatic stay in the administration of the Debtor's estate. *See* 11 U.S.C. § 362; 28 U.S.C. § 157(b). Federal rules of privilege govern the Debtor's federal claims. *See* Fed. R. Evid. 501 ("the privilege of a witness, person…shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience"); *Religious Technology Center v. Wollersheim*, 971 F.2d 364, 367 n.10 (9th Cir. 1992) (stating that under R. 501, federal common-law privileges govern federal question cases); *Vondrak v. City of Las Cruces*, 2009 U.S. Dist. LEXIS 42208, 12-13 (D.N.M. Apr. 8, 2009) (stating that R. 501 indicates that federal privilege law should apply to federal claims).

The Debtor's state-based contract and tort claims are pendent to the federal bankruptcy claim since all those claims derive from the same operative facts and, considered without regard to their federal or state character, would ordinarily be tried in one judicial proceeding. *E.g.*, *Lyon v. Whisman*, 45 F.3d 758, 760 (3d Cir. 1995).[143] Accordingly, the federal litigation privilege applies to the state law claims as well because, as the Third Circuit has stated, in "resovl[ing] this potential conflict in favor of federal privilege law," it would be "unworkable" to "apply[] two separate disclosure rules with respect to different claims," especially where the claims involve the same nexus of facts. *Pearson v. Miller*, 211 F.3d 57, 66 (3d Cir. 2000). *See also William T. Thompson*

---

[143] *See In re Direct Satellite Communications, Inc.*, 91 B.R. 5, 6 (Bankr. E.D. Pa. 1988) ("We can perceive no reason why a bankruptcy court cannot exercise pendent jurisdiction and hear non-federal claims raised in a proceeding before it, in the same fashion as any other federal court."); *Melamed v. Lake County Nat'l Bank*, 727 F.2d 1399, 1403 (6th Cir. 1984) (holding the district court did not abuse its discretion in permitting a tortious interference state claim to be asserted pursuant to the district court's pendent jurisdiction in a bankruptcy case); *see also In re Cuyahoga Equip. Corp.*, 980 F.2d 110 (2d Cir. 1992) (stating that a district court could exercise jurisdiction supplemental to its bankruptcy jurisdiction). Independent of this analysis, bankruptcy courts also have the ability to exercise a form of pendent jurisdiction over state law "core" and "non-core" claims. 28 U.S.C. §§ 157(b)(2), (c)(1); *See, e.g., Halper v. Halper*, 164 F.3d 830, 837 (3d Cir. 1999)(a bankruptcy court maintains non-core jurisdiction over a claim if it "could conceivably have [an] effect on the estate being administered in bankruptcy."); *In re Winstar Comm'ns, Inc.*, 554 F.3d 382, 405 (3d Cir. 2009) (holding that it was unnecessary to affirm the bankruptcy court's ruling that a debtor's breach of contract claim against its lender was "core," since the court still maintained "related to" jurisdiction to try a state law claim against a lender because the lender had filed a proof of claim in the bankruptcy).

*Co. v. Gen. Nutrition Corp.*, 671 F.2d 100, 104 (3d Cir. 1982) (indicating when there are federal claims in a case also presenting state law claims, the federal rule favoring admissibility rather than the state law privilege rule is controlling). Other federal circuit courts agree.[144]

> 1. *The Federal Common-Law Litigation Privilege Does Not Shield Defendants' Out-of-Court Statements.*

Rules of privilege are generally looked upon with disfavor by the federal courts. *Hancock v. Hobbs*, 967 F.2d 462, 466-467 (11th Cir. 1992). The federal common-law litigation privilege, in particular, is narrow. It protects only attorneys, witnesses, judges, state prosecutors, and other participants with respect to their communications in judicial proceedings.[145] In this respect the federal litigation privilege is significantly narrower than California's, which, as discussed in Section VIII(A) below, may extend to out-of-

---

[144] *E.g., Virmani v. Novant Health Incorp.*, 259 F.3d 284, 287 n.3 (4th Cir. 2001) ("We agree with our sister circuits that in a case involving both federal and [pendent] state law claims, the federal law of privilege applies."); *von Bulow v. von Bulow*, 811 F.2d 136, 141 (2d Cir. 1987) (declaring that, where the evidence sought "is relevant to both the federal and [pendent] state claims," courts "consistently have held that the asserted privileges are governed by the principles of federal law"); *Hancock v. Dodson*, 958 F.2d 1367, 1373 (6th Cir. 1992) (holding that "the existence of pendent state law claims does not relieve us of our obligation to apply the federal law of privilege"); *Memorial Hosp. v. Shadur*, 664 F.2d 1058, 1061 n.3 (7th Cir. 1981) (concluding that the fact that a complaint asserts a pendent state claim does not change the applicability of federal privilege law); *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 367 n.10 (9th Cir. 1992) (holding, in a case involving both federal and pendent state claims, that federal litigation privilege law applies); *Hancock v. Hobbs*, 967 F.2d 462, 466-67 (11th Cir. 1992) (holding that "the federal law of privilege provides the rule of decision in a civil proceeding where the court's jurisdiction is premised upon a federal question" and that "when the federal and state laws of privilege are in conflict," courts "have uniformly held that the federal law of privilege governs even where the evidence sought [in discovery] might be relevant to a pendent state claim"); *In re Sealed Case (Medical Records)*, 381 F.3d 1205, 1212-13 (D.C. Cir. 2004).

[145] *See, e.g., Briscoe v. LaHue*, 460 U.S. 325, 334-336 (1983)(stating that the common-law privilege protects witnesses, judges, and prosecutors); *Steffes v. Stepan Co.*, 144 F.3d 1070, 1075 (7th Cir. Ill. 1998)(stating that the common-law litigation privilege applies to attorneys, witnesses, judges, and other participants in judicial proceedings); *Cohen v. Pelicano*, 2005 U.S. Dist. LEXIS 40249, 20-21 (C.D. Cal. July 12, 2005)("Judges and other participants in the judicial process are given absolute immunity to protect the 'judicial process' and assure that all can 'perform their respective functions without harassment or intimidation.'")(quoting *Briscoe*); *Barany-Snyder v. Weiner*, 2007 U.S. Dist. LEXIS 5137, 31-32 (N.D. Ohio Jan. 24, 2007)("The Supreme Court has recognized a traditional common-law immunity for witnesses, judges and attorneys with respect to their conduct in judicial proceedings.")(citing *Briscoe*); *Dommisse v. Napolitano*, 474 F. Supp. 2d 1121, 1133 (D. Ariz. 2007)(suggesting the "privilege might apply if [plaintiff] claims he was harmed only by the report [defendants] submitted to the [Arizona Medical Board]" and not by statements made outside of the hearing).

46

court statements. There appears to be no case in which a court found a defendant's out-of-court statements to third parties protected by the federal privilege. On the other hand, federal courts have held that a defendant's out-of-court statements to a third party, even though related to the litigation, were not protected by the federal litigation privilege. For example, in *Steffes v. Stepan Co.*, an employee of defendant corporation Stepan, acting on corporate counsel's advice, communicated with third-party Dow Chemical, which had hired plaintiff Steffes after Stepan had terminated her employment, and in the course of the conversation, told Dow about Steffes's Anti-Discrimination Act ("ADA") suit against Stepan. *Steffes v. Stepan Co.*, 144 F.3d 1070, 1074-75 (7th Cir. 1998). The lower court held that the communication was privileged, finding that it was pertinent to the litigation between Steffes and Stepan, since Steffe's ADA claim would gain support if she could show that Dow had hired her for a similar position. *Id.* at 1074. The Seventh Circuit overruled the lower court. The Circuit court noted, "[f]irst, the common-law litigation privilege, traditionally understood, applies to attorneys, witnesses, judges, and other participants in judicial proceedings"; and the employee who called Dow was, as an employee of Stepan, an agent of the company and not, as the lower court had characterized him, an agent of Stepan's attorneys. *Id.* at 1075. And, second, the Circuit court found that extending the privilege in this circumstance could interfere with the policies underlying the anti-retaliation provisions of the ADA. *Id.*

By the same reasoning, Defendants' claim of privilege should be rejected in this case because it is Defendants' own out-of-court statements, not those of its counsel, to third parties that are at issue, and because, as discussed below, extending the privilege would interfere with the policies underlying key provisions of federal bankruptcy law. Defendants' statements to potential third party buyers should, therefore, enjoy federal litigation privilege protection.

47

2. *Application of the Federal Common-Law Litigation Privilege in This Case Is Antithetical to the Purpose of and Policies Underlying That Privilege.*

Extending the federal litigation privilege to Defendants' statements to potential third-party buyers would not satisfy the purposes of that privilege, which protects individuals in the judicial process so that they can perform their functions without harassment or intimidation. Thus, witnesses are protected in order to be "given every encouragement to make a full disclose of all pertinent information" and ensure that their testimony is honest and candid. *Briscoe*, 460 U.S. 334-35 (quoting *Imbler v. Pachtman*, 424 U.S. 409, 439 (1976)); *Cohen v. Pelicano*, 2005 U.S. Dist. LEXIS 40249, * 20-21 (C.D. Cal. July 12, 2005). Permitting privilege to shield Defendants' statements to potential buyers would not satisfy the purpose of the federal common-law privilege. Finally, permitting the privilege to sheild Defendants' statement to potential third party buyers would interfere with federal bankruptcy law's interest in maximizing the value of the debtor's estate. *See, e.g.*, *Steffes*, 144 F.3d at 1075 (holding that the defendant's out-of-court statements were not privileged because "fundamentally, recognition of the litigation privilege sought by the appellees could interfere with the policies underlying" the federal law at issue).

B. **Even if the California Litigation Privilege Were Applicable, It Would Not Protect Defendants' Statements to Potential Third-Party Buyers.**

Defendants' misrepresentations to potential buyers do not satisfy the requirements of the California litigation privilege because (1) there was no litigation pending at the time the misrepresentations were made; (2) Defendants did not have a good faith belief that a *bona fide* dispute existed and made their misrepresentations for coercive purposes; and (3) Defendants' misrepresentations were not made to participants in judicial or quasi-judicial proceedings. *See* Cal. Civ. Code § 47(b)(2); *Silberg v. Anderson*, 50 Cal. 3d 205, 212, 219-20 (1990).

48

1.    *There Was No Litigation Pending For the Purposes of Invoking the California Litigation Privilege.*

Contrary to Defendants' assertion, they are not litigants or participants in litigation for the purposes of California's litigation privilege. (*See* Opening Brief at 51-52.) Defendants do not cite, nor do there appear to be, any cases applying California's litigation privilege to statements by creditors in a bankruptcy case speaking outside of the court. [146] Even if Defendants qualify as "participants" in the bankruptcy, their statements are clearly "extraneous to" and not "in furtherance of" the primary purpose of the bankruptcy, namely, disposing of Debtor's assets to the maximum benefit of all creditors. *See Silberg*, 50 Cal. 3d at 219-20.

Defendants' litigation privilege argument fails for another fundamental reason: they fail to identify any pending "litigation" that would shield their communications. California's litigation privilege does not extend to statements made after an action is dismissed or otherwise resolved. *See e.g.*, *Laffer v. Levinson, Miller, Jacobs & Phillips*, 34 Cal. App. 4th 117, 123 (1995). Prior to the institution of the litigation at hand, the only pleadings Defendants filed were related to the Debtor's Sales Motion [Docket No. 165] to approve general bid procedures and for the sale of the Debtor's assets. In response, Defendants filed: (a) the Limited Objection [Docket No. 240, filed March 10, 2009], which Defendants purportedly brought to "clarify" their putative rights under the LP Agreement, Lease, and a retail lease held by Lance-Kashian-related entities and to

---

[146] The two cases Defendants cite, *Wood* and *Nilsen*, apply the litigation privilege to a bankruptcy proceeding involving persons centrally involved with the bankruptcy process speaking either in court, or in the course of fulfilling their official duties. (*See* Opening Brief. at 48.) *Wood* involved a potential buyer's objection to an asset purchase agreement made *at a sale hearing* before the bankruptcy court. *Wood v. Cumulus Broad., LLC (In re Wood)*, 2009 Bankr. LEXIS 2324, at *4 (Bankr. E.D. Va. 2009). *Nilsen* involved statements regarding a debtor's principal made by a Chapter 11 trustee while carrying out the trustee's *statutory duties* as the court-appointed representative of the debtor's bankruptcy estate. *Nilsen v. Neilson (In re Cedar Funding, Inc.)*, 419 B.R. 807, 825 (9th Cir. 2009). Other cases applying the litigation privilege to a bankruptcy proceeding also involve persons speaking either in court or speech by a trustee or other official. *E.g.*, *In re Davis*, 312 B.R. 681, 689 (Bankr. D. Nev. 2004) (holding that Chapter 7 debtors could not sue the Chapter 7 trustee for libel and slander based on statements made regarding the debtors *before the bankruptcy court and in pleadings*).

49

"assure that those rights are not ignored"[147]; (b) a supplemental objection pertaining to the Debtor's proposed cure amounts in the Sales Motion [Docket No. 260, filed March 12, 2009]; (c) an objection to the Debtor's bid procedures in connection with an auction of the Debtor's leases and other property assets, which included a "renewal" of Defendants' prior objection to the Debtor's proposed cure amounts [Docket No. 474, filed May 4, 2009]; and (d) a limited objection to the bid protections associated with the proposed sale of the Debtor's retail lease (not at issue in the current litigation), which incorporated by reference Defendants' prior objections [Docket No. 561, filed May 22, 2009].[148]

Defendants' objections related to the Debtor's Sales Motion were mooted when on April 7, 2009 and June 10, 2009, respectively, the Court entered orders approving the sale of certain assets to Great American [Docket No. 347] and Forever 21 [Docket No. 623] (not including the LP Interest or Lease).[149] Confirming the fact that Defendants had no outstanding objection, Defendants' counsel stated at the July 1, 2009 hearing on bid protections that "we have no objection with respect to the bid protections. We wanted a point of clarification, I guess, given how the sale process has sort of evolved." Defendants' counsel went on to confirm that Defendants were actually seeking "just clarification" regarding whether the Debtor would be seeking to sell the partnership interest free of the default provision.[150] The nature of the rights being offered for sale was clarified on the record:

> [The Court:]  Well, as I understand from the proposal, they're offering a limited partnership interest.
>
> [Defendants' counsel:]  Period.

---

[147]  Limited Objection ¶ 11.

[148]  Objections to the Debtor's sale of its leasehold interests to Macy's Department Stores, Inc., including the retail lease to which Defendants had interposed a bid protections objection, were overruled on the merits.  Order Approving Assumption and Assignment of Certain Leases..., ¶ 1, entered June 11, 2009 [Docket No. 624].

[149]  Transcript, Apr. 1, 2009, 56:12 - 57:10.

[150]  Transcript of July 1, 2009 hearing (the "July 1 Tr."), 6:2 - 7:8 (select excerpts quoted).

[The Court:] Period.

[Defendants' counsel:] And that would be my client's (sic) position, as well, so we'll act accordingly.[151]

Even if Defendants' objections—most of which do not relate the LP Interest or Lease—could qualify as "litigation" between the parties, that "litigation" ended when the Sales Motion was resolved.[152] At that point, the "litigation"—if such thing ever existed—terminated. Indeed, the Debtor subsequently filed a motion to sell the LP Interest and Lease to Hilco Realty [Docket No. 680, filed June 26, 2009]. Defendants did not file any objection. They did not assert that their prior "limited objection" applied to that transaction or somehow required resolution. At the recent confirmation hearing on the Debtor's Plan, Defendants attempted to make much of the fact that they had not objected to the Hilco transaction as evidence that they had no general objection to the sale of the property.[153] The foregoing record disproves any assertion by Defendants that they were in some long-running "litigation" with the estate, growing from objections filed to a long resolved Sale motion. Simply put, as of June 2009, Defendants' objections were resolved or moot, well before Kashian made his misrepresentations to KKV in September of 2009.

2.  *There Are Material Questions of Fact Regarding Whether Defendants Had a "Good Faith" Belief That a Bona fide Dispute Existed at the Time They Made Their Misrepresentations.*

The purpose of the California litigation privilege is to "afford litigants and witnesses the utmost freedom of access to the courts," to "promote[] effective judicial proceedings by encouraging open channels of communication and the presentation of evidence" and to "obligate[] litigants to expose the bias of witnesses and the falsity of evidence during trial" by "safeguard[ing] litigants and witnesses from subsequent tort suits so that they are not intimidated from pursing litigation or speaking frankly."

---

[151] July 1 Tr., 9:11-16.

[152] *See* April 7, 2009 and June 10, 2009 Orders [Docket Nos. 347 and 623.

[153] See Transcript, Mar. 16, 2010, 33:12-18.

*Silberg*, 50 Cal.3d at pp. 213–214; *Home Ins. Co. v. Zurich Ins. Co.*, 96 Cal. App. 4th 17, 23 (2002); *Shafer v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone*, 107 Cal. App. 4th 54, 82 (2003). Holding a creditor or a general partner liable for his tortious statements to potential buyers of the debtor's property would not frustrate any of these purposes.[154]

Recognizing the admittedly broad scope of the litigation privilege, California courts have set specific limitations on it. This is particularly true with regards to out-of-court statements made prior to the institution of litigation. Under California law, the litigation privilege only applies to statements made in connection with a *bona fide* dispute, not those made merely to coerce an unwarranted settlement or those made as a litigation tactic. *See, e.g., Edwards v. Centex Real Estate Corp*, 53 Cal. App. 4th 15, 39 (1997) ("[E]ven a *threat to commence litigation will be insufficient to trigger application of the [litigation] privilege* if it is actually made as a *means of inducing settlement of a claim, and not in good faith contemplation of a lawsuit*.") (emphasis added); *Am. Products Co., Inc. v. Law Offices of Geller, Stewart & Foley, LLP*, 134 Cal. App. 4th 1332, 1341 (2005) (declining to apply the litigation privilege to demand letters not sent in good faith by the attorneys who engaged in a pattern or practice of initiating lawsuits for settlement purposes and dismissing them shortly thereafter); *A.F. Brown Electrical Contractor Inc., v. Rhino Elec. Supply, Inc.*, 137 Cal. App. 4th 1118, 1128 (2006) (holding that a threat "to pursue all available legal remedies" was merely a collection effort and *not* sufficient to invoke the litigation privilege).

Whether or not the communication has been made in good faith with a connection to a *bona fide* dispute is a question of fact. *Edwards*, 53 Cal. App. 4th at 35. The party

---

[154] None of the cases Defendants cite (Opening Brief at 52) involve statements as tenuously connected as those of a creditor to a potential buyer of a debtor's assets; and so none of the cases Defendants cite supports finding the privilege applicable to the facts of this case. For example, Defendants cite *Sacramento Brewing*, in which a court unsurprisingly found that an incorrectly captioned *notice in a motion* to sell a bankrupt estate's property constituted a statement adequately related to the bankruptcy litigation the notice meant to invoke. *Sacramento Brewing Co. v. Miller & Desmond*, 75 Cal. App. 4th 1082, 1090 (1999).

asserting the privilege must provide evidence in support of its claim. *Id.* at 39 (for a party to be able to "take advantage of the [litigation] privilege by applying it to their *own* communications, they must establish that at the time they made the subject communications, they *themselves* actually *contemplated prospective litigation, seriously and in good faith*") (emphasis added.). Here, all of Defendants' statements were made out of court, and there was no litigation pending. Indeed, the Debtor had no pending motion seeking approval of KKV or another buyer. At the time of the misrepresentations, Powell had made an offer and was meeting with Kashian for due diligence purposes. Defendants assert—without providing a shred of evidence—that their communications were made to ensure that KKV was a qualified buyer under Bankruptcy Code Section 365 who could meet Park 41's financial obligations. (Opening Brief at 50-51.) However, at his deposition, Kashian conceded that he never bothered to ask for or review KKV's financial information:

> Q. Did you ask Mr. Powell for information about the fiscal resources of this group?
> A. No.[155]

Given the pattern and practice of interference demonstrated by the Debtor's evidence and Kashian's foregoing admission, there is a material issue of fact whether Defendants' representations were made in anticipation of a *bona fide* qualification process or merely to cut off that process by coercing the Debtor's potential buyers into abandoning their potential investment. This precludes summary judgment. *Compare Am. Products Co., Inc.*, 134 Cal. App. 4th at 1341 (reversing summary judgment granted on the grounds of the litigation privilege).

---

[155] Kashian deposition at 229:22-24.

3. *Defendants' "Publication" to Nonparticipants Is Not Protected by the Litigation Privilege.*

Finally, because the potential buyers to whom Defendants made the statements at issue are non-participants in any litigation, the statements were not made in "judicial or quasi-judicial proceedings." *See e.g.*, *Silberg*, 50 Cal. 3d at 212, 219 ("republications to nonparticipants in the action are generally not privileged under section [former] 47(2), and are thus actionable unless privileged on some other basis"); *Rothman v. Jackson*, 49 Cal. App. 4th 1134, 1146, 1148-49 (1996) (statements to the members of the press are not privileged because statements to such non-participants do not serve the purposes of the litigation process). Potential buyers of a debtor's assets are not "participants" in the bankruptcy and have no cognizable interest in administration of estate assets. In an analogous situation, case law already limits the rights of losing bidders at Section 363 sales to object to sales of estate assets. *See, e.g., In re Planned Systems, Inc.*, 82 B.R. 919 (Bankr. S.D. Ohio 1988) (a frustrated bidder at a sale of estate property under Bankruptcy Code Section 363(b) normally lacks standing to object to the sale). Thus, RPP III's statements to potential buyers of the Debtor's assets are not privileged even if (as is not the case) RPP III's statements to potential buyers satisfied the other requirements of § 47(b).[156]

IX. **THE DEBTOR'S BREACH CLAIMS BASED UPON MANAGEMENT ACTIONS ARE NOT PROTECTED BY THE BUSINESS JUDGMENT RULE.**

As discussed above in Sections I(E) and IV(B)(3), Defendants—being aware of the financial burden placed on the Debtor's estate by maintaining the lease—acted to increase this burden by, among other things, performing unnecessary "improvements" to

---

[156] In any event, the California litigation privilege cannot be used to bar the Debtor's claims arising from Defendants violation of the automatic stay. As discussed in Section IV, Defendants' interference with the Debtor's efforts to assign its assets violate the automatic stay. A state litigation privilege also cannot defeat a federal cause of action. *E.g., Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 851 (9th Cir. 2004).

the landscaping and withholding the Debtor's distributions. Based on these acts, the Debtor brought claims for breach of the LP Agreement (Seventh Claim for Relief), breach of the covenant of good faith and fair dealing (Eighth Claim for Relief), and breach of fiduciary duty (Ninth Claim for Relief). Defendants assert that their actions are shielded by Section 2.08 of the LP Agreement and the business judgment rule.

Section 2.08 is not applicable to the Debtor's allegations because it expressly omits acts of willful misconduct. This provision of the LP Agreement also does not shield Defendants from violating their fiduciary duty—which as a matter of law cannot be waived. *Everest Investors*, 114 Cal. App. 4th at 424 ("The fiduciary obligations of a general partner with respect to matters fundamentally related to the partnership business cannot be waived or contracted away in the partnership agreement."). Section 2.01 of the LP Agreement restricts expenditures to those "necessary to carry out [Park 41's] business and to preserve [Park 41's] assets and interests." Accordingly, Defendants bear the burden of establishing that their expenditures were necessary to carry out Park 41's business and preserve Park 41's assets and interests. *Combs*, 190 Cal. App. 2d at 166 ("The burden of establishing the account is on the trustee, including the burden of showing that any expenditure made was a proper disbursement."); *see also Laux v. Freed*, 53 Cal. 2d 512, 522 (1960) ("As partners, neither had the right to take an unfair advantage or secure an undue benefit, and the burden is on the one seeking an advantage to show complete good faith and fairness toward the other.").

California's business judgment rule only insulates from court intervention those management decisions that are made by directors in good faith and in the absence of a conflict of interest in what the directors believe is the organization's best interest. *E.g.*, *Lee v. Interinsurance Exchange*, 50 Cal. App. 4th 694, 714 (1996); *Berg & Berg Enterprises, LLC v. Boyle*, 178 Cal. App. 4th 1020, 1045 (2009). The presumption that a director's decisions are based on sound business judgment is overcome when the plaintiff alleges facts that, if proven, would establish that the director had a conflict of interest or

55

acted with improper motives. *Id.* Accordingly, a facially reasonable act, like the withholding of distributions, may still be actionable if taken for an improper purpose.

There are material facts at issue that, if proven, would show that Defendants were subject to a conflict of interest and that they acted with the improper motive of squeezing out the Debtor.[157] Under these facts, Defendants are not entitled to summary judgment on the Debtor's breach claims based on Defendants' management actions. Furthermore, the Debtor has provided evidence of a pattern of wrongful activity by Defendants that included acts, first, to discourage potential buyers; second, to drive down the price of the LP Interest; and, third, to dilute the Debtor's interest in the partnership.[158] This pattern of wrongful conduct rebuts any presumption that Defendants' management decisions were motivated by proper business interests that would warrant protection under the business judgment rule.

## X. THE DEBTOR'S CLAIMS FOR INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE DO NOT FAIL AS A MATTER OF LAW.

The Debtor's tenth and eleventh claims for relief allege that Defendants intentionally, or at the very least negligently, interfered with the Debtor's prospective contract with KKV to purchase the Debtor's LP Interest and Lease, by making the misrepresentations detailed above in Sections I and IV. There is no merit to Defendants' assertion that these claims fail as a matter of law

### A. Defendants' Economic Interest in the Partnership Does Not Preclude Their Tortiously Interfering With the Debtor's Prospective Economic Advantage in the Sale of Its Interest in the Partnership.

Defendants contend that an entity and its agents, employees, and partners cannot tortiously interfere with a contract, and, by extension, a prospective economic advantage,

---

[157] *See e.g.,* Section IV, *supra.*

[158] *See e.g.,* Sections I(C)-(E), *supra.*

in which the entity has an "economic interest." (Opening Brief at 61.) That is not the law in California.[159]

In California, one cannot tortiously interfere with another's contract or prospective business interest if one has a "direct interest or involvement" in it. *See e.g., Nat'l Rural Telcoms. Coop. v. DIRECTV, Inc.*, 319 F. Supp. 2d 1059, 1069-70 (C.D. Cal. 2003). However, California case law makes clear that an economic relationship to a contract or prospective business interest does not constitute a direct interest or involvement. For example, in *Woods v. Fox Broadcasting*, the California Court of Appeal rejected the view that interference claims could not be brought against third party beneficiary shareholders because of their economic interests. *Woods v. Fox Broadcasting Sub., Inc.*, 129 Cal. App. 4th 344, 356 (2005). Similarly in *G&C Auto Body*, the California Court of Appeal concluded that "*Woods* rejected the defendant's contention that an intentional interference with prospective economic advantage claim should fail because the defendant was not a stranger to the relevant economic relationship." *G&C Auto Body Inc. v. GEICO Gen. Ins. Co.*, 552 F. Supp. 2d 1015, 1019 (N.D. Cal. 2008).

*PM Group, Inc. v. Stewart*, on which Defendants heavily rely, does not contradict the conclusion that economic interests do not constitute a direct interest. (Opening Brief at 62-63.) In *PM Group*, a promoter and subpromoters sued musician Rod Stewart for interference in contracts, to which Stewart was not a party, between the promoter and

---

[159] Defendants misrepresent the holdings of *Applied Equipment*, 7 Cal. 4th 503 (1994), and *Kasparian*, 38 Cal. App. 4th 242 (1990). (Opening Brief at 61). While it is true that an entity, and its agents, cannot interfere with a contract to which it is a *party* (as Defendants note, citing *Applied Equipment*), it is not true that a mere *interested party* who has only an economic relationship for the reasons discussed in this Section. *See, e.g., Woods v. Fox Broadcasting Sub., Inc.*, 129 Cal. App. 4th 344, 356 (2005); *G&C Auto Body Inc. v. GEICO Gen. Ins. Co.*, 552 F. Supp. 2d 1015, 1020 (N.D. Cal. 2008). Similarly, Defendants improperly conflate a party to a contract with an "interested party." *Kasparian* only states that because *a party* to a contract cannot tortiously interfere in that contract, "the same rationale should also bar prosecution of the tort of interference with prospective economic advantage against *a party* to the relationship from which the plaintiff's anticipated economic advantage would arise." *Kasparian v. County of Los Angeles*, 38 Cal. App. 4th at 262 (emphasis added). Defendants' equivocation of "a party" and "interested parties" is telling and misrepresents *Kasparian*. Defendants are of course not parties to the never-realized contracts between Gottschalk and potential third parties buyers.

57

subpromoters. *PM Group, Inc. v. Stewart*, 154 Cal. App. 4th 55, 57-61 (2007). The court found that Stewart was not a stranger to the contracts and so could not tortiously interfere with them. *Id.* at 65. Nowhere, however, does the court suggest that this is because Stewart had an economic interest in the contracts. To the contrary, the court states the reason Stewart was not a stranger to the contracts was "[b]ecause the subcontracts at issue here provided for Stewart's performance"—literally Stewart's performance: in concert. *Id.* at 65. What *PM Group* stands for, then, is the proposition that one is not a stranger to a contract or, by extension, a prospective business relationship, if one's substantive performance is or will be required in order for the contracted-for or anticipated venture to be successfully conducted.

The relationship between Defendants, on the one hand, and a prospective transaction between Debtor and KKV is fundamentally different from Rod Stewart's relationship to the dispute between the promoters. The Debtor and the potential buyer were not seeking Defendants' performance. Rather, they were seeking to engage in an exchange of certain of the Debtor's assets. Although Defendants' wrongfully interfered with that transaction, the disruption is not that Defendants failed to deliver their promised performance but that they injected themselves on the scene and made misrepresentations. With nothing but a purely economic interest in its Park 41 partner, Defendants are necessarily strangers to the relationship between the Debtor and potential third party buyers. Therefore, Defendants are not legally precluded from tortiously interfering with the Debtor's prospective sale of the LP Interest.

B.     **The Debtor Can Show Independently Wrongful Acts to Support Its Prospective Interference Claims.**

Defendants assert that their misrepresentations to potential third party buyers cannot constitute independently wrongful acts because these statements are protected by California's litigation privilege. (Opening Brief at 65.) As discussed in Section VII

58

*supra*, Defendants misrepresentations are not protected by the applicable federal common-law litigation privilege or the California litigation privilege. Defendants also assert that their acts of mismanagement of Park 41 are protected by the business judgment rule and Section 2.08 of the Agreement of Limited Partnership. (Opening Brief at 66). As discussed in Section IX, *supra*, Defendants' acts are not protected by the business judgment rule or Section 2.08 of the LP Agreement.

Accordingly, there are material facts at issue which satisfy the "independently wrongful" acts requirement.

### C. There are Issues of Material Fact Concerning Whether Defendants Caused the Debtor to Lose a Prospective Economic Benefit.

Defendants place a great deal of importance on the fact that Kashian purportedly did not interfere with USB, Hilco, or McCormick, each of which had a passing interest in the Debtor's assets. Defendants' argument misses the point. Kashian's actions with these other bidders do not excuse his interference with Debtor's potential sale to KKV or his poisoning of the Fresno market. Indeed, the inconsistencies in Kashian's representations to different parties only serve to highlight his culpability and lack of veracity. (*See* Section I, *supra*.)

### 1. USB

Kashian has always favored USB as a buyer because it never intended to be a long-term holder of the Debtor's LP Interest and Lease and was offering a base price for these assets.[160] USB's primary interest was addressing its disputed lien on the Debtor's LP Interest.[161] In June of 2009, USB offered $1.5 million to the Debtor for its LP Interest and Lease, the first million of which would be paid directly to the bank to expunge the

---

[160] *See, e.g.,* Powell Deposition at 48:4-22.

[161] *Id.*; Ex. 59, Woods Deposition at 46:6-47:7.

59

lien.[162]

After this offer was rejected by the Debtor, Kashian continued to encourage USB, informing its President and Chief Executive Officer, Dennis Woods ("Woods"), that there would not be any other bidders for the Debtor's assets.[163] Meanwhile, Kashian's counsel regularly wrote to Powell, who in addition to being a principal of KKV is also USB's counsel, encouraging the bank to bid a "base price"[164] by emphasizing the Debtor's vulnerable position.[165] However, at some point, USB became disenchanted with pursuing its own purchase offer, and Woods suggested that Powell should bid with the bank's backing.[166] This might have been an elegant solution for all involved—except for Kashian, who has no desire to take on a long-term partner and was determined to control the limited partnership interest himself. When Kashian learned that USB was no longer interested and that KKV was now the bidder, Kashian, through his counsel, accused Powell of engaging in "smokescreens."[167]

    2.    *KKV*

The Debtor's claims for interference with prospective economic advantage primarily turn on Defendants' material misrepresentations to KKV. It is undisputed that on September 11, 2009, KKV submitted a letter of intent to the Debtor offering $2 million dollars for its LP Interest and Lease.[168] It is also undisputed that on or around September 17, 2009, KKV's principal, Powell, met with Kashian, after which KKV

---

[162] Ex. 20, June 16, 2009 USB Offer Letter.

[163] *See e.g.,* Woods Deposition at 105:19-106:10; *see also* Ex. 31, September 16, 2009 E-Mail from Woods to Powell.

[164] Ex. 22, August 18, 2009 E-mail from Wilhelm to Powell.

[165] Ex. 24, August 21 E-Mail; Ex. 26, September 2 E-Mail.

[166] Ex. 59, Woods Deposition at 22:25-23:12; 52:6-15.

[167] Ex. 17 September 17, 2009 E-mail from Wilhelm to Powell.

[168] Ex. 27, September 11 KKV LOI.

withdrew its letter of intent on October 8, 2009, citing *inter alia* Kashian's representations as the bases for KKV's withdrawal.[169] The conflicting and unsupportable nature of Kashian's representations to KKV is detailed above in Sections I(C)(1) and IV(A)(2). Recognizing that these material misrepresentations cannot be justified, Defendants offer several alternative reasons for KKV's withdrawal from its offer, each of which is addressed below.

Defendants first assert that the Debtor cannot show that the consummation of its deal with KKV was probable. (Opening Brief at 66-67, 69-70.) Not so. As Powell testified, before the September 17 meeting, KKV was firmly set to proceed with its offer to the Debtor:

> Q. Okay. What I mean by genuine I'm asking you was it your understanding at the time that KKV and its partners were generally interested in pursuing the purchase of the partnership and leasehold interests for 2 million dollars?
>
> A. Yes.[170]

Indeed, on September 14, Powell was drawing up proposals and gathering his financial information to consumate the deal.[171]

Defendants next assert that KKV did not have the financial strength to purchase the Debtor's interest. (Opening Brief at 69.) Again, not true. KKV was formed in 2008 and currently holds—*debt free*—an asset worth approximately $4.5 million.[172] Powell himself is a real estate investor in the Fresno market who owns six buildings and has over thirty years of experience.[173] KKV also had the financial backing of USB and Woods,

---

[169] Ex. 34, October 8 KKV Withdrawal E-mail.

[170] Powell Deposition at 82:22-83:2.

[171] Ex. 30, September 14, 2009 E-mail from Woods to Powell.

[172] KKV was formed in 2008 and currently owns one building worth $4.5 million, unencumbered by debt. *See id.* at 24:16-26:19; 26:25-27:6; 135:12-21.

[173] Powell Deposition at 11:4-12:4; *Id.* at 14:1-13.

who pledged to support KKV's applications for financing.[174] This did not matter to

Kashian, though, as he never even asked to see KKV's financial qualifications.[175]

Defendants also argue that it was Kashian's refusal to absorb the Debtor's lease

back into the partnership, KKV's concerns regarding the costs associated with

retenanting the Debtor's Space, and the suspension of distributions that caused the deal to

fall apart. (Opening Brief at 70-71.) This theory is contradicted by Powell, who was

aware that Defendant could reject his offer to return the Lease to the Partnership and

testified that KKV was able pay for retenanting the Space if necessary.

> The whole discussion we had about financing tenanting improvements and
> paying for those improvements, financing it or the cash call was in the
> context of something that KKV didn't want to do but *if they had to do it
> they could do it*.[176]

While Kashian's refusal to take back the Debtor's Lease and Space from KKV did not

kill the deal, it does reveal a fundamental flaw in Kashian's representations and logic. As

discussed above in Section IV(A)(2), there would be no need to suspend distributions or

to make a capital call in the amount stated by Kashian if KKV retained the Lease,

because KKV would be responsible for the costs of retenanting.

Citing Powell's testimony, Defendants further assert that KKV was in "over [its]

head." (Opening Brief at 72.) Powell's testimony is not surprising considering that

Kashian represented to KKV that it would be responsible for both retenanting the

Debtor's Space *and* for an imminent $8 million dollar capital call. Indeed, the portion of

Powell's testimony that Defendants strategically omit from their block quotation on

pages 71-72 of their Opening Brief shows that it was the combination of both of both the

capital call and Kashian's refusal to take the Lease that caused KKV to withdraw:

Q. Okay. And what was the substance of those conversations?

---

[174] Ex. 57, Powell Deposition at 58:1-60:2.

[175] Ex. 56, Kashian Deposition at 229:22-230:8.

[176] Ex. 57, Powell Deposition at 86:18-22.

A. The substance of the conversation was they no longer had an interest in pursuing a partnership, that it could end up costing them more money than they have the ability to call at any one time. *The capital call would -- was too great.*[177]

Kashian's representations regarding the capital call was a material factor in KKV's withdrawal, without which it was probable that the deal would have been consummated.

Lastly, Kashian denies that he ever told Powell that there would be an imminent $8 million capital call. (Opening Brief at 70 n.22.) However, at his deposition Kashian admitted to quoting the $8 million figure to Powell:

Q. [Did you -- during the meting with Mr. Powell] -- was there any discussion about a potential capital call?

A. Yeah.

Q. What did you say in that regard?

A. I told them that in the worst-case conditions, if the world came to an end, we would have to re-tenant the whole building. In my opinion, the cost would be about 8 million over the next three or four years.[178]

Whether Kashian stated that the capital call was "imminent" or spread over 3-4 years makes no difference. The $8 million figure is clearly unreasonable. Defendants' own expert report projects less than half that amount being needed over the same time period and under the same conditions.[179] The parties' conflicting evidence and theories create material issues of fact precluding summary judgment.

3.    *Hilco and McCormick*

Notwithstanding Defendants' current assertions, Kashian did not believe that Hilco was a serious threat to his plans for the Debtor's assets:

. . . [Hilco] were perhaps known to be a stalking horse in bankruptcy court just to make money at the stalking horse game and that he [Wilhelm] did

---

[177] Ex. 57, Powell Deposition at 130:6-12.

[178] Ex. 56, Kashian Deposition at 233:1-12.

[179] Ex. 46, Kabat Report, Appendix I.

not consider them to have true intent to actually acquire and own a partnership with real estate so far away from home base.[180]

The same is true for McCormick:

> Q. Did you view McCormick Barstow as a serious bidder?
>
> A. No.
>
> Q. You didn't. Why not?
>
> A. Because I know that law firm backwards. There is -- majority of those lawyers are not going to take one bit of risk. Zero. Zilch.[181]

Accordingly, Kashian had no need to discourage or make material misrepresentations to either, believing that both deals would collapse without his intervention.

In fact, McCormick lost interest in the building as a result of Kashian illegitimately passing the costs of the roof recoating onto Park View Plaza's tenants and failing to amortize that cost over the life of the roof.[182] As Kenneth Baldwin, McCormick's partner in charge of facilities testified, it was this act of improper management that "broke the camel's back" and caused McCormick to withdraw its interest in acquiring the Debtor's LP Interest and lease.[183]

## XI.     THE DEBTOR HEREBY WITHDRAWS ITS CLAIMS FOR RELIEF AGAINST JENNIFER SCHUH AND ITS SIXTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS.

The Debtor brought its claims against Schuh based on her capacity as Co-Chief Executive Officer of Lance-Kashian and in the good faith belief that she was involved in the wrongful conduct described herein. However, discovery has shown that Schuh was not an active participant and the actions she took were pursuant to the instructions of Kashian, her Co-Chief Executive Officer and father. Accordingly, the Debtor hereby

---

[180] Id. at 45:16-46:6; see also Ex. 22, August 18 E-mail from Wilhelm to Powell.

[181] Ex. 56, Kashian Deposition at 196:14-20.

[182] Ex. 37, October 21, 2009 Redacted E-mail from Baldwin to Ambro; Ex. 49, Baldwin Deposition at 92:11-16.

[183] Id.

withdraws its claims against Schuh.

The Debtor's Sixth Claim for Relief asserts that Defendants intentionally interfered with the LP Agreement by causing Park 41 to account improperly for the recoating of the Park View Plaza roof. Defendants assert that this claim is barred as a matter of law because a party cannot be held liable for interfering with its own contract. (*See* Opening Brief 59-60.) Although Defendants are not direct parties to the LP Agreement, Defendants argue that they are not strangers to the agreement as required to bring this claim. The Debtor has elected not to pursue this claim for relief, without prejudice to the Debtor's contention that Defendants manipulated the accounting to foist additional charges on the Debtor.

RLF1 3560650v.1

## CONCLUSION

For all the foregoing reasons, there are genuine issues of material fact as to all of

the Debtor's claims for relief and, except to the limited extent set forth in the immediately

preceding Section, Defendants' motion for summary judgment motion should be denied.

Dated: April 14, 2010                      Respectfully submitted,
       Wilmington, Delaware

/s/ Lee E. Kaufman
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Lee E. Kaufman (No. 4877)
Drew G. Sloan (No. 5069)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

Stephen H. Warren (*admitted pro hac vice*)
Marc F. Feinstein (*admitted pro hac vice*)
Karen Rinehart (*admitted pro hac vice*)
Justine Daniels (*admitted pro hac vice*)
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

*Attorneys for the Debtor and*
*Debtor-in-Possession*

66